**U.S. STEEL GROUP A UNIT OF USX CORPORATION, USS/Kobe Steel Co., and Koppel Steel Corp., Plaintiffs,**

v.

**UNITED STATES, Defendant,**

**Siderca S.A.I.C. and Siderca Corporation, Defendant–Intervenors.**

**Slip Op. 97–95.**
**Court No. 95–09–01144.**

United States Court of
International Trade.

July 14, 1997.

---

Skadden, Arps, Slate, Meagher & Flom (Robert E. Lighthizer, John J. Mangan), Washington, DC, for Plaintiffs U.S. Steel Group a Unit of USX Corp, USS/Kobe Steel Co., and Koppel Steel Corp.

Schagrin Associates (Roger B. Schagrin, R. Alan Luberda), Washington, DC, for Plaintiff–Intervenor Maverick Tube.

Wiley, Rein & Fielding (Charles Owen Verrill, John R. Shane), Washington, DC, for Plaintiff–Intervenor North Star Steel.

Frank W. Hunger, Assistant Attorney General; David M. Cohen, Director; Velta A. Melnbrencis, Assistant Director, Dept. of Justice, Civil Division, Commercial Litigation Branch; Barbara Campbell–Potter, Attor-

ney–Advisor, Office of the Chief Counsel for Import Administration, Dept. of Commerce, for Defendant.

White & Case (David P. Houlihan, Gregory J. Spak, Christopher M. Curran, Richard J. Burke), Washington, DC, for Defendant–Intervenors Siderca S.A.I.C. and Siderca Corp.

## OPINION

POGUE, Judge.

Plaintiffs, Siderca and Siderca S.A.I.C. ("Siderca") and U.S. Steel ("domestic producers"), filed separate actions challenging aspects of the International Trade Administration's final determination in *Oil Country Tubular Goods From Argentina*, 60 Fed. Reg. 33,539 (Dep't Commerce 1995) (final det.) [hereinafter Final Det.]. The two actions were consolidated.

The Court has jurisdiction under 28 U.S.C. § 1581(c) and 19 U.S.C. § 1516a(a)(2)(A).

### BACKGROUND

On July 26, 1994, Commerce initiated an antidumping investigation of oil country tubular goods (OCTG) from Argentina pursuant to 19 U.S.C. § 1673a (1988). *Oil Country Tubular Goods From Argentina, Austria, Italy, Japan, Korea, Mexico, and Spain*, 59 Fed.Reg. 37,962 (Dep't Commerce 1994) (init. antidumping duty investigations).[1] In such an investigation, Commerce compares foreign market value and United States price[2] to determine whether dumping exists, and to calculate the dumping margin.

In the course of the investigation, Commerce issued an antidumping questionnaire to Siderca and verified Siderca's responses. Commerce determined that home market (i.e., Argentine) sales were not "viable" during the period of investigation, January 1 through June 30, 1994, i.e., Commerce decided that Siderca's home market sales were not adequate for the purpose of determining foreign market value ("FMV") of oil country tubular goods ("OCTG"). Therefore, Commerce decided to base FMV upon sales of OCTG to the People's Republic of China ("PRC" or "China").[3]

In its preliminary determination, Commerce found a dumping margin for Siderca of 0.61%. *See Oil Country Tubular Goods From Argentina*, 60 Fed.Reg. 6503 (Dep't. Commerce 1995) (prelim. det. & postponement final det.). Subsequently, Commerce issued an Amended Preliminary Determination in order to correct the Preliminary Determination for a clerical error. *See Oil Country Tubular Goods From Argentina*, 60 Fed.Reg. 13,119 (Dep't. Commerce 1995) (am.prelim.det.). In the Amended Preliminary Determination Commerce found a dumping margin for Siderca of 0.42%, *see id.* at 13,119, a de minimis dumping margin under Commerce's regulations.[4]

After verification, Commerce made a final determination that Siderca's dumping margin was 1.36%. *See Final Det.*, 60 Fed.Reg. at 33,550. Because Commerce found a dumping margin for Siderca above the de minimis level, and the International Trade Commission found that a domestic industry was ma-

---

1. OCTG are hollow steel products of circular cross-section, including oil well casing, tubing, and drill pipe, or iron (other than cast iron) or steel (both carbon and alloy), whether seamless or welded, whether or not conforming to American Petroleum Institute ("API") or non-API specifications, whether finished or unfinished (including green tubes and limited service OCTG products). 59 Fed.Reg. at 37,962.

2. 19 U.S.C. §§ 1677a, 1677b (1988). The terminology has since changed. The antidumping law was amended by the Uruguay Round Agreements Act, Pub.L. No. 103–465, 108 Stat. 4809 (1994) (URAA). The URAA does not apply to investigations initiated prior to January 1995. Under the current statute "normal value" has replaced the term "foreign market value," and "export price"

and constructed export price" have replaced the term "United States price." *See* 19 U.S.C. §§ 1677a, 1677b (1994).

3. FMV is normally based upon the sales price of the merchandise in the home market. Because Commerce determined that the home market was not a viable one for the relevant time period, Commerce based FMV on Siderca's sales to a third country market, i.e., the PRC. *See* 19 U.S.C. § 1677b(a)(1)(B). This decision is not challenged in this action.

4. Pursuant to regulations applicable to this antidumping investigation, Commerce disregards any weighted-average dumping margin that is less than 0.5% *ad valorem*. *See* 19 C.F.R. § 353.6.

terially injured or threatened with material injury by reason of imports of the subject merchandise. *See Oil Country Tubular Goods from Argentina,* 60 Fed.Reg. 41,055, 41,055 (Dep't. Commerce 1995) (antidumping duty order). Commerce issued an antidumping duty order for OCTG from Argentina. *Id.*

Siderca objects to Commerce's Final Determination contending that Commerce's circumstance of sale ("COS") adjustment for indirect tax rebates was improper. The domestic steel producers object to the Final Determination for the following reasons: 1) In determining Siderca's cost of production, Commerce relied on budgeted rather than actual figures for Siderca's per-unit fixed costs; 2) Commerce allowed Siderca to offset its general expenses with revenues from miscellaneous sales; and 3) Commerce deducted the full amount of Siderca's indirect tax rebate from its cost of production.

### Standard of Review

In reviewing a final antidumping determination the Court of International Trade must decide whether Commerce's determination is in accordance with law and whether Commerce's conclusions are supported by substantial evidence on the record. 19 U.S.C. § 1516a(b)(1)(B)(1994).

■■■ When Commerce's interpretation of the antidumping statute is challenged, this court applies the two-step analysis articulated in *Chevron U.S.A. v. Natural Resources Defense Council, Inc.,*[5] as applied and refined by the Federal Circuit. Considerable weight is accorded Commerce's construction of the antidumping laws, whether that construction manifests itself in the application of the statute, *see, e.g., Daewoo Elec. Co. v. Int'l Union of Elec., Technical, Salaried and Mach.*

*Workers,* 6 F.3d 1511, 1516 (Fed.Cir.1993), *cert. denied* 512 U.S. 1204, 114 S.Ct. 2672, 129 L.Ed.2d 808 (1994), or in the promulgation of a regulation, *see, e.g., Smith–Corona Group v. United States,* 713 F.2d 1568, 1575 (Fed.Cir.1983), *cert. denied* 465 U.S. 1022, 104 S.Ct. 1274, 79 L.Ed.2d 679 (1984).

When examining Commerce's factual determinations to decide whether they are supported by substantial evidence, the court must determine whether the record contains "such relevant evidence as a reasonable mind might accept as adequate to support Commerce's conclusion." *Consol. Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938); *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951) (*quoted in Matsushita Elec. Indus. Co., Ltd. v. United States,* 3 Fed. Cir. (T) 44, 750 F.2d 927, 933 (1984)). Substantial evidence "is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Maritime Comm'n,* 383 U.S. 607, 620, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966) (citations omitted).

### The Circumstance of Sale Adjustment

#### A. Facts Pertinent To Siderca's COS Adjustment Issue

The Government of Argentina has adopted a cumulative, indirect tax system pursuant to which certain indirect taxes are imposed at various stages of production, become embedded in the price of the product at those stages, and are then passed on to the next stage through the price of the intermediate product. This system is cumulative because

---

**5.** When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the

absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Chevron U.S.A. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984) (footnotes omitted). *See generally* Kenneth Culp Davis & Richard J. Pierce, Jr, Administrative Law Treatise, § 3.2 (1994).

the indirect taxes imposed at a given stage of production become embedded in the price of the product at the next stage of production, with indirect taxes again imposed on the total value of the product at that stage. The Government of Argentina also has a tax rebate program (the reintegro system, formerly the reembolso system), which provides for government rebate, upon export, of indirect taxes imposed and embedded in the price of the finished product.

In response to Commerce's antidumping questionnaire, Siderca reported that the indirect tax rebate amount it received for sales of OCTG to the United States differed from the rebate amount for sales to the PRC. Specifically, for sales to the PRC, Siderca received the full amount of the allowable rebate for OCTG: 15%. For sales to the United States, however, Siderca received only a partial rebate of the total allowable amount: 8.3%. (U.S. Dep't. of Commerce Verification of Production and Constructed Value Data, April 26, 1995 at 2 (Mem. U.S. Steel Group, in Opp'n. to the Mot. for J. Agency R. Siderca, Tab 5)).

In the Final Determination, Commerce explained:

> Included in Siderca's manufacturing costs of OCTG are taxes paid to the Argentine government. Siderca received a rebate of these taxes upon exportation of the merchandise. However, the amount of the rebate claimed by Siderca for the two export markets was not identical. . . . Because only a partial rebate is taken for U.S. sales, a portion of the tax imposed by the Argentine government remains in the U.S. price (the difference between the total rebate and the partial rebate taken). Be-

cause these rebates are directly related to the sales of the merchandise in the two markets, it is necessary to make a circumstance-of-sale adjustment to FMV to account for the different amount of taxes included in the Chinese and U.S. prices. . . .

> In calculating dumping margins, the Department equalizes the effective rates in each market. Normally (. . . the home market sale is taxed, but the export sale to the United States is not taxed). . . . Here, . . . the pipe exported to the United States was taxed in excess of the tax on the pipe exported to China. . . . Because the statute provides no mechanism for removing tax from the U.S. price, however, we achieved the necessary equivalence in tax rates by adding the difference between the effective rebate percentages claimed by Siderca . . . to the price of the pipe exported to China as a circumstance-of-sale adjustment, . . . . This prevented Siderca's acceptance of a complete tax rebate on the sales to China, but only a partial export tax rebate on the sales to the United States from masking any tax-net dumping margin.

60 Fed.Reg. at 33,546–47 (Comment 6).

Commerce raised FMV by 6.1%,[6] which is the amount of the difference in rebates claimed by Siderca between sales for export to the PRC and to the United States.

### B. Discussion

1. Siderca argues that Commerce's circumstances of sale adjustment was "inconsistent with the statutory provisions governing the permitted adjustments to USP and FMV, . . . ." (Mem. P. & A. Supp. of Mot. Siderca S.A.I.C. and Siderca Corp. for J. on

---

6. The reason for raising FMV by 6.1%, and not 6.7% was that Siderca reported average effective rebates and, as Commerce explained, it calculated the difference between these average effective rebates:

> We calculated the difference between the effective rebate received on sales to China and the effective rebate received on sales to the U.S. The respective nominal rebates, 15% and 8.3%, are applied to the FOB price adjusted for importations of materials under temporary importation bond. Siderca calculated the average effective rebate for both markets, see verification exhibit 19. Siderca calculated ef-

fective rebates by first dividing the shipment specific rebate by the FOB price, then calculating a weighted average for the period. The effective rebate to China was 13.68%. The effective rebate to the U.S. was 7.58%. The difference between the effective rebate received on sales to China and the effective rebate received on sales to the U.S. was 13.68% − 7.58% = 6.1%. This amount represents an adjustment to third country price.

Mem. from Accountant to Program Manager of Office of Accounting, dated June 16, 1995, at 2, para. 4, Prop. Doc. 89, Def.'s Ex. 19.

the Agency R. [hereinafter Siderca's Mot. J. Agency R.] at 18). As Siderca points out, indirect taxes are mentioned only once within these statutory provisions, at 19 U.S.C. § 1677a(d)(1)(C), which says that USP shall be increased by:

> the amount of any taxes imposed in the country of exportation directly upon the exported merchandise or components thereof, which have been rebated ... by reason of the exportation ... to the extent that such taxes are added to or included in the price of such or similar merchandise when sold in the country of exportation.

"Implicit in this provision," Siderca argues, "is that the price comparison at issue involve (sic) a comparison off the USP to an FMV that is based on the exporter's sales in its home market." (Siderca's Mot. for J. Agency R. at 19). The government agrees that the provision applies only when FMV is based on home-market sales. *See* letter from U.S. Department of Justice to U.S. Court of International Trade, October 8, 1996 at 8 ("The statutory scheme provides specifically for an adjustment for rebated taxes only when the comparison is between sales to the U.S. and sales for home market consumption....") As Commerce noted in the Final Determination, in the usual case, home-market sales are taxed and exports are not taxed. In such a case, when comparing the prices of merchandise exported to the United States and merchandise exported to a third country, no adjustment for taxes is necessary. The statute does not contain a provision that specifically addresses the situation now before the court, in which sales in the United States are taxed in excess of sales in the country upon which FMV is based.[7]

In the absence of such a provision, Commerce made an adjustment pursuant to 19 U.S.C. § 1677b(a)(4)(B) (1988), which states:

> In determining foreign market value, if it is established to the satisfaction of the administering authority that the amount of any difference between the United States price and the foreign market value (or that the fact that the United States price is the

same as the foreign market value) is wholly or partly due to ...

> (B) other differences in circumstances of sale ... then due allowance shall be made therefor.

Siderca argues that under the statute the tax rebate does not qualify as a circumstance of sale. Siderca also argues that the adjustment does not meet the requirements of the regulation enacted by Commerce to carry out the circumstance of sale provision. The regulation states:

> In calculating foreign market value, the Secretary will make a reasonable allowance for a *bona fide* difference in the circumstances of the sales compared if the Secretary is satisfied that the amount of any price differential is wholly or partly due to such difference. In general, the Secretary will limit allowances to those circumstances which bear a direct relationship to the sales compared.

19 CFR § 353.56. Siderca contends that the regulation's "direct relationship" language has been interpreted to mean that the party requesting the COS adjustment must show a causal link between the alleged circumstance of sale and the price of the subject merchandise. Siderca concludes that Commerce has failed to adequately demonstrate that such a link exists and that the COS adjustment was not lawful. The Court does not agree.

In *Smith–Corona Group v. United States*, 1 Fed. Cir. (T) 130, 713 F.2d 1568 (1983), *cert. denied* 465 U.S. 1022, 104 S.Ct. 1274, 79 L.Ed.2d 679 (1984), the court held that Section 1677b(a)(4) "does not expressly limit the exercise of the Secretary's authority to determine adjustments, nor does it include the precise standards or guidelines to govern the exercise of that authority.... Congress has deferred to the Secretary's expertise in this matter." *Id.* at 137, 713 F.2d at 1575. Thus Commerce has broad discretion to decide what constitutes a bona fide circumstance of sale. *See id.* at 132, 713 F.2d at 1571.

---

7. Siderca accepts a full tax rebate on merchandise sold to the PRC and only a partial tax rebate for merchandise sold to the United States. The

net effect is that Siderca pays a higher tax on goods sold to the United States.

■ *In Sawhill Tubular Div. Cyclops Corp. v. United States*, 11 CIT 491, 666 F.Supp. 1550 (1987), the court found that Commerce had properly made a circumstance of sale adjustment in the amount of an export rebate paid to a foreign carbon steel pipe and tube manufacturer. The *Sawhill* court rejected plaintiff's argument that a circumstance of sale adjustment is appropriate only in the case of a difference in selling expenses. "[T]his Court declines to adopt ... a narrow construction of the circumstances of sale provision. Section 1677b(a)(4)(B) was designed to facilitate a fair and efficient comparison between foreign market value and price i the United States market." *Id.* at 497, 666 F.Supp. at 1555. Thus, *Sawhill* established that under certain circumstances an export rebate can constitute a circumstance of sale. As in *Sawhill*, in this case Commerce has established that the rebate was " 'directly related to, and in fact contingent upon, the export sale of the merchandise under investigation.' " *Id.* at 498, 666 F.Supp. at 1555–56 (quoting *Certain Welded Carbon Steel Standard Pipe and Tube from India*, 51 Fed.Reg. 9089, 9091 (Dep't Commerce 1986)(final det.). *See also Ad Hoc Committee of AZ–NM–TX–FL Producers of Gray Portland Cement v. United States*, 13 F.3d 398, 400 (Fed.Cir.1994) ("[t]here is no specific statutory authorization for Commerce to deduct home-market transportation expenses from its calculations of FMV. In the past, Commerce determined whether to deduct home-market transportation costs by looking to the 'circumstances of sale' provision of 19 U.S.C. § 1677b(a)(4) (1988)."), *cert. denied sub nom Cemex, S.A. v. United States*, 513 U.S. 813, 115 S.Ct. 67, 130 L.Ed.2d 23 (1994).

The rebate also meets the conditions set out in *Budd Co., Wheel & Brake Div. v. United States*, 14 CIT 595, 746 F.Supp. 1093 (1990). The *Budd* court stated, "circumstance of sale adjustments 'should be permitted if they are reasonably identifiable, quantifiable, and directly related to the sales under consideration and if there is clear and reasonable evidence of their existence and amount.' " 14 CIT at 607, 746 F.Supp. at 1103 (quoting H.R.Rep. No. 96–317, at 76 (1979) ... ). The reintegro rebate was both identifiable and quantifiable, based on evidence presented to Commerce by Siderca. As stated above, the reintegro was also directly related to the sales under consideration. Therefore, Commerce's determination that the different rebate amounts constituted different circumstances of sale was a reasonable application of the statute.

Siderca argues that under *Mantex, Inc. v. United States*, 17 CIT 1385, 841 F.Supp. 1290 (1993), Commerce may only make a circumstance of sale adjustment if a causal link is established between the differing circumstances of sale and the differing amounts of FMV and USP. In *Mantex*, the court affirmed Commerce's decision not to grant a COS adjustment for rebates received by a foreign manufacturer on exported goods. "[T]o be entitled to a COS adjustment," the court said, "an importer must demonstrate a 'causal link' ... between the differences in circumstances of sale and the differential between United States price and foreign market value." 17 CIT at 1396, 841 F.Supp. at 1300 (citing *Smith–Corona v. United States*, 1 Fed. Cir. (T) at 138, 713 F.2d at 1577).

The scope of the "causal link" requirement was discussed in *Brother Industries Ltd. v. United States*, 3 CIT 125, 540 F.Supp. 1341 (1982), *aff'd sub nom. Smith–Corona Group v. United States*, 1 Fed. Cir. (T) 130, 713 F.2d 1568 (1983), *cert. denied* 465 U.S. 1022, 104 S.Ct. 1274, 79 L.Ed.2d 679 (1984). The *Brother* court stated, "it must be stressed that the statute requires only that a causal link be established to the *satisfaction of the administering authority*." 3 CIT at 130, 540 F.Supp. at 1349 (emphasis in original). Also, "if there are differences in circumstances of sale, and if there is also a price differential, then the administering authority will be satisfied that there is a causal connection between those events upon a showing ... that the costs to the seller are different,...." *Id.* at 131, 540 F.Supp. at 1350.

■ *Mantex* did not diminish Commerce's discretion to find that a causal link exists when costs to the seller are in different in different markets; *Mantex* simply says that

Commerce does not have to make such a finding. *See* 17 CIT at 1398, 841 F.Supp. at 1302 ("[A]lthough [the rebate at issue] may explain the company's lower United States price relative to its home market, Commerce is not required to assume such a causal relationship exists.")

■ The reasoning of *Smith–Corona* supports Commerce's COS adjustment in this case. *See Smith–Corona*, 1 Fed. Cir. (T) at 139, 713 F.2d at 1577 n. 26 ("[A]bsent evidence that costs do not reflect [FMV], the Secretary may reasonably conclude that cost and value are directly related."); *see also Daewoo Elecs. Co. v. Int'l Union*, 6 F.3d 1511, 1518–19 (Fed.Cir.1993), *cert. denied* 512 U.S. 1204, 114 S.Ct. 2672, 129 L.Ed.2d 808 (1994)(holding that Commerce need not conduct an econometric study to measure the pass-through of indirect taxes to home market consumers).

The difference in costs for sales to the United States and costs for sales to the PRC due to the different rebate amounts was amply demonstrated by Siderca's own submissions and verified by Commerce staff. (Commerce Verification Mem., April 26, 1995 at 13 (Mem. of U.S. Steel Group Opp'n. Mot. J. Agency R. Siderca, Tab 5)) ("We tested the actual receipt of payments from the government to Siderca for export sales to both the U.S. and China."). Siderca's submissions also support Commerce's finding that the tax rebate amounts are reflected in the price of the finished product. Siderca specifically stated in its response to Section C of Commerce's questionnaire that "[b]ecause indirect taxes are rebated on all exports ... the *price* for the merchandise sold in the comparison market (China) does not include any indirect taxes." (Def.'s Ex. 9 at 18–19) (emphasis added). Furthermore, in its brief to this Court, Siderca describes the reintegro system as one in which taxes which are "imbedded in the finished product produced and sold in the domestic market ...." are rebated to "reduce or eliminate any disadvantage that the country's exporters otherwise would face in export markets as a result of these domestic indirect taxes." (Siderca's Mot. for J. Agency R. at 5).[8]

2. Siderca also argues that Commerce's circumstance of sale adjustment "is [b]ased on a[s]erious [m]isrepresentation of [r]ecord [f]acts." *Id.* at 25. Specifically, Siderca claims that much of the pipe sold in the United States during the period of investigation was exported from Argentina before the rebate for the U.S. market was lowered to 8.3 percent. *Id.* at 25. "Simply stated, the 'difference in export rebates' which the Department explained as its sole justification for its circumstance of sale adjustment simply did not exist for much of the Siderca pipe sod in the U.S. during the period of investigation." *Id.* at 25–26. As evidence for this contention, Siderca provided the Court with

---

**8.** Siderca argues that the only reason the Government of Argentina lowered the rebate to 8.3 percent was "Argentina's specific good-faith effort to avoid or offset a possible subsidy on products shipped to the U.S. in deference to U.S. countervailing duty law." (Siderca's Mot. J. Agency R. at 34). Siderca cites 19 U.S.C. § 1677a(d)(2)(B) for the proposition that "[w]here, as here, the exporting country reduces its effective indirect tax rebate rate with the specific intent 'to offset the subsidy received,' such reduction cannot be used to create a dumping margin where one does not otherwise exist." *Id.*

Section 1677a(d)(2)(B) says specifically that U.S. price shall be reduced by:
the amount, if included in such price, of any export tax, duty or other charge imposed by the country of exportation on the exportation of the merchandise to the United States other than an export tax, duty or other charge described in section 1677(6)(C) of this title.

Section 1677(6)(C) refers to "export taxes, duties, or other charges levied on the export of merchandise to the United States" to offset a countervailable subsidy.

In this case Commerce did not reduce U.S. price for any export tax, duty or other charge related to the reintegro rebates. COS adjustments are made to FMV and the adjustment in this case was made to account for differing levels of tax rebates in the U.S. and Chinese markets. A reduction of a tax rebate does not constitute an export tax, duty or other charge for the purposes of 19 U.S.C. § 1677(6)(C). The COS adjustment allowed a comparison of U.S. and Chinese sales on a comparable basis. The dumping margin found by the department did not result from Siderca's acceptance of a lower rebate on U.S. sales. Rather, the dumping margin resulted from Commerce's comparison of Siderca's U.S. and Chinese prices on a comparable basis after adjusting for tax differences.

Argentine Resolution 1754/93.[9]

Siderca did not make this factual argument or submit the Argentine Resolution to Commerce during the administrative proceeding. Rather, Siderca contends that Commerce was aware of the Resolution and urges the Court to take judicial notice of it as a foreign official record. However, even if the Court were to take judicial notice of the Resolution, the Court could not just accept Siderca's claim that it received the full 15–percent rebate on POI sales to the United States. According to a 1995 letter from the Government of Argentina, responding to Commerce's 1993 countervailing duty investigation, although the reintegro rate for exports to the United States was formally set at 8.3 percent by Resolution 1754/93, "Siderca ... agreed to repay the difference between the two rates [ (the nominal 15 percent rate and the requested 8.3 percent rate) ] for exports to the United States between November 1, 1992 and January 4, 1994." (Mem. U.S. Steel Group Opp'n. Mot. J. Agency R. Siderca, Ex. 1).

It would be inappropriate for this Court to usurp Commerce's investigatory role by delving beyond the record to decide this factual issue. Moreover, it is not necessary for the Court to pursue this inquiry.

In its questionnaire response, Siderca reported that the reintegro rate for exports of OCTG to China was 14.75 percent, and the rate for exports to the United States was 7.8 percent. *Id.* at Tab 1 (Attach.D–19). These figures were verified by Commerce. It is on the basis of this information that Commerce made its COS adjustment to FMV. Thus, Commerce's determination that Siderca received different rebates on its United States and Chinese sales during the period of investigation was supported by substantial evidence, provided by Siderca, on he record. Therefore, the Court will not disturb that determination.

3. Finally, Siderca argues that Commerce never gave Siderca an opportunity to comment on the circumstance of sale adjustment, and for that reason, the adjustment was pro-

cedurally unfair. Siderca's Mot. J. Agency R. at 27. According to Siderca, "[the Department] announced a completely new approach to an important issue for the first time in its final determination, after all opportunity for comment and argument had passed." *Id.*

The record shows, however, that Siderca was aware that the difference in tax rebates could be an issue in this investigation. On March 2, 1995, after publication of the Preliminary Determination and before Commerce conducted its on-site verification, counsel to a co-petitioner submitted a letter to the Department suggesting avenues of inquiry for the forthcoming verification. (Letter from Wiley, Rein & Fielding to Secretary of Commerce of March 2, 1995, Prop. Doc. 60, Def.'s Ex. 14). In that letter, counsel framed the rebate issue as one concerning sales, and not cost, stating in relevant part:

I. *SALES VERIFICATION*

A. *The "Reembolso" (rebates)*

In its preliminary determination, the Department did not adjust U.S. and third country prices for rebated indirect taxes, contrary to long-standing Department practice and precedent. *According to the company's own figures* Siderca receives an average of US$40/ton more in rebates on its sales to China than sales to the United States. In cases where third country ales are being used as the basis for FMV, and there is a significant differential in the amount of rebated duties or taxes between the markets, the Department adjusts the prices in both markets by the amount of the rebates (citations omitted).

*Id.* at 2 (emphasis supplied).

Siderca demonstrated its awareness of petitioner's letter by responding to the letter in its rebuttal brief, "[P]etitioners ... [argue] that the prices in a price-to-price comparison should be adjusted for the rebated taxes.... Based on the final determination and the Department's calculation memorandum, this

9. According to the English translation provided by Siderca, Resolution 1754/93 officially set the reimbursement level for exports of OCTG to the U.S. at 8.3 percent. By its own terms, the resolution did not come into force until its publication date, Jan. 4, 1994. (Pls.' App. 5.)

appears to be an incorrect interpretation." Siderca's Rebuttal Br. at 51 n. 116.

Siderca also had ample opportunity to present exactly the factual evidence it is trying to present here. Commerce specifically asked that Siderca "[s]tate the amount of indirect taxes applicable to each sale, whether or not included in the price," for both Chinese and U.S. sales. Antidumping Req. Info., attached to Aug. 26 Letter, Antidumping Duty Investigation of Oil Country Tubular Goods (OCTG) from Argentina, App. I, Section B–1, field 17; and App. I, Section C–1, field 16. Instead of supplying this information, Siderca merely stated that no adjustment to U.S. price was necessary "since the taxes are rebated on all export sales and the price for the merchandise sold in both the U.S. and China are exclusive of the indirect taxes." (Siderca's Resp. to section B of the Department's questionnaire at 6)(Conf. App. To Br. U.S. Steel in Supp. Mot. J. Under Rule 56.2, Tab 3). In addition, Department of Commerce regulations permit any interested party to make a submission to rebut, clarify, or correct factual information submitted by an interested party within 10 days of service of the submission. *See* 19 C.F.R. § 353.31(a)(2). Siderca never challenged the factual supposition underlying petitioner's suggestion, that different reintegro rates were applied to Siderca's Chinese and U.S. sales during the period of investigation. Instead, Siderca made a legal argument that the statute does not permit an adjustment for indirect taxes when FMV is based on third-country sales.

Because Siderca had ample notice that the difference in tax rebates was an issue in Commerce's investigation, and because Commerce specifically asked for the information necessary to make a determination on this issue, this case is distinguishable from the cases cited by Siderca: *Usinor Sacilor, Un-imetal and Ascometal v. United States*, 893 F.Supp. 1112 (CIT 1995), *British Steel plc v. United States*, 879 F.Supp. 1254 (CIT 1995), *Creswell Trading Co., Inc. v. United States*, 15 F.3d 1054 (Fed.Cir.1994) and *Sigma Corp. v. United States*, 17 CIT 1288, 841 F.Supp. 1255 (1993), in which Commerce's determinations were remanded to correct procedural unfairness.

PETITIONERS' COST OF PRODUCTION ISSUES

### A. Siderca's Fixed Factory Overhead Costs

Plaintiffs, the Petitioners at the administrative level alleged that Siderca's prices to China were below the cost of production (COP). Commerce used Siderca's cost data to calculate the cost of production for the OCTG sold to the PRC, and determined that there were no below-cost sales.[10]

In its Section D questionnaire, Commerce requested Siderca to submit cost of production figures including fixed and variable costs. Siderca's accounting system assigns only materials costs and variable costs to individual units of merchandise, and not fixed costs. (Dep't Commerce Verification of COP and CV Data at 7 (April 26, 1995) (Defs' Ex. 16)). "As a general rule, Commerce considers variable factory overhead costs to be those cost items which are a function of the production levels. Fixed factory overhead costs are those costs that do not vary as production levels increase or decrease." (Def.'s Mem. Opp'n. Mot. Siderca Partial Opp'n. Mot. U.S. Steel Group J. Upon the Agency R. at 49, n. 33). To comply with Commerce's request, Siderca allocated the actual fixed costs to specific cost centers and then allocated those costs to individual products based on the products' budgeted machine hours and productivity (tons/machine hour) for the given cost center.

---

**10.** Preliminary Determination, 60 Fed.Reg. at 6505.

Under 19 U.S.C. § 1677b(b), if Commerce determines that sales made at less than cost of production "(1) have been made over an extended period of time and in substantial quantities, and (2) are not at prices which permit recovery of all costs within a reasonable period of time in the normal course of trade ..." it must disregard such sales when determining FMV. If the remaining above-COP sales were insufficient for determining FMV, Commerce would have calculated FMV on the basis of constructed value (CV) for the OCTG models sold to the United States and compared the CV-based FMV with the United States price. Because Commerce found that the sales to China were not below-COP, it did not need to compare CV-based FMV with USP. Thus, CV is not involved in this case.

Plaintiffs charge that Siderca's reported product-specific fixed costs were not reflective of Siderca's actual costs. (Mot. U.S. Steel Group A Unit of USX Corp., USS/Kobe Steel Co., and Koppel Steel Corp. J. Under Rule 56.2 at 26–36). "[T]he allocation system calculated Siderca's product-specific fixed costs based on *budgeted,* rather than actual, operating hours and *standard,* rather than actual, productivity rates." *Id.* at 27 (emphasis in original). Due to Siderca's use of budgeted hours and standard productivity rates, Commerce was unable to reconcile Siderca's questionnaire response to its financial statements, which reflect actual costs. *See* Final Det. at 33,548.

"Where a respondent submits information that cannot be verified," plaintiffs argue, "the Department must use best information otherwise available" ("BIA")(Pls.' Mot. at 36). Commerce responds that although it could not reconcile the data submitted by Siderca, it performed three alternative verification procedures to test Siderca's allocation methodology for fixed costs. "These alternative verification procedures gave Commerce a 'reasonable assurance of the accuracy' of the respondents' reported costs...." (Def.'s Mem. in Opp'n. Mot. Siderca S.A.I.C. and Siderca Corp. and Partial Opp'n. Mot. U.S. Steel Group a Unit of USX, Corp., et. al. for J. Agency R. at 60).

▆▆▆ The antidumping law requires that Commerce verify all information relied upon in making a final determination in an investigation. 19 U.S.C. § 1677e. In publishing its determination Commerce is to "report the methods and procedures used to verify such information." 19 U.S.C § 1677e(b). The statute does not specify how verification is to be accomplished. It does stipulate that "[i]f the administering authority is unable to verify the accuracy of the information submitted, it shall use the best information available to it as the basis for its action, ..." *Id.* Here, as an alternative verification procedure, Commerce compared Siderca's average company-wide fixed costs per ton to the per-unit fixed costs allocated by Siderca to the subject merchandise. This comparison led Commerce to conclude that Siderca's allocation of fixed costs was reasonable. Commerce also veri-

fied that the fixed costs were assigned to individual cost centers and allocated to each product using productivity ratios used in the allocation of variable costs. (Def.'s Mem. Opp'n. Mot. Siderca S.A.I.C. and Siderca Corp. and Partial Opp'n. Mot. U.S. Steel Group a Unit of USX, Corp., et al for J. Agency R. at 51).

"Congress has afforded ITA a degree of latitude in implementing its verification procedures.... The decision to select a particular method of verification rests solely within the agency's sound discretion." *Floral Trade Council v. United States,* 17 CIT 392, 399, 822 F.Supp. 766, 772 (1993)(upholding the ITA's decision not to apply BIA based on ITA's claim that it was able to verify respondent's questionnaire response through "alternative means") (citations omitted); *see also American Alloys, Inc. v. United States,* 30 F.3d 1469, 1475 (Fed.Cir.1994) ("[T]he statute gives Commerce wide latitude in its verification procedures.").

In this case, Commerce relied on Siderca's normal accounting practices and then verified Siderca's cost data reporting and cost accounting system. The Court finds that Commerce's alternative verification methods were adequate under the circumstances and represented a reasonable application of 19 U.S.C. § 1677e.

In addition to the requirement that Commerce's interpretation of the antidumping statute be reasonable, the law requires that Commerce's factual findings be supported by substantial evidence on the agency record. *See* 19 U.S.C. § 1516a(b)(1)(B). The "reasonableness test" conducted by Commerce showed that Siderca's reported fixed costs for the subject merchandise were different than its company-wide per-unit fixed costs. Commerce accepted Siderca's explanation that the discrepancy was due to the difference between the mix of products manufactured for export to the United States and the PRC and Siderca's overall product mix.

The Court finds hat there is sufficient evidence on the record demonstrating Siderca's company-wide product mix and the mix of products contained in the subject merchandise to support Commerce's determination. Specifically, Siderca's production report for

fiscal year 93/94, discussed by Commerce in its verification report, demonstrates that there was no significant difference between Siderca's budgeted and real production during the relevant period. Under the heading *"Facturable Por Producto,"* the report shows a breakout of production by product type, and by end finish. Summing the actual production of plain end casing and plain end tubing yields a total plain end production of 66,616 tons, approximately 10 percent of Siderca's total actual production. (Siderca S.A.I.C. Cost Verification Ex. 12)(Mem. P & A of De–Ints. Siderca S.A.I.C. and Siderca Corp. Opp. Pls.' Mot. J. Agency R., App. 8). This supports Siderca's statement that "approximately 10 percent of Siderca's production is plain end pipe." (Siderca's Case Brief at 29). Siderca's related statement, that "virtually 50 percent of the merchandise sold to the United States is plain end ...," *id.* at 30, is supported by Siderca's explanation that it ships plain end pipe to the United States for threading at its manufacturing facilities in Houston. (Siderca's Section E Response at 4, Nov. 10, 1994). That explanation is supported by Siderca's U.S. sales listing. (Def.'s Ex. 14 of Prop. Doc. 32).

Accordingly, the Court finds that Commerce's use of alternative verification methods was a permissible construction of the antidumping statute, and that Commerce's determination as to Siderca's allocation of fixed costs was supported by substantial evidence on the record.

### B. *The Use of Miscellaneous Income to Offset Siderca's General Expenses*

In calculating cost of production, Commerce adds to the producer's cost of manufacture (materials, labor and overhead costs) an amount for general and administrative expenses. "General and administrative expenses (G & A) are an element of COP and consist of those expenses which relate to the activities of the company as a whole, rather than to the production process." (Def.'s Mem. Opp'n. Mot. Siderca S.A.I.C. and Siderca Corp. and Partial Opp'n. Mot. U.S. Steel Group a Unit of USX, Corp., et al. J. Agency R. at 65).

[11] In calculating Siderca's cost of production Commerce offset general and administrative expenses with "miscellaneous income" comprised of revenues from the sale of intermediate products such as sponge iron, bar, and other miscellaneous products; sales of OCTG purchased from other countries and resold in other countries; and sales of technical assistance to other steel companies. (Rebuttal Br. on Behalf of Siderca S.A.I.C. and Siderca Corp. at 58–59 (May 17, 1995)(Def.'s Ex. 18)).

According to Commerce's final determination, "miscellaneous income relating to production operations *of the subject merchandise* may be permitted as an offset to G & A." Final Det. at 33550 (citing *Saccharin from Korea,* 59 Fed.Reg. 58,826, 58,828 (Dep't Commerce 1994)(final det.))(emphasis added). The court finds that this approach represents a permissible construction of the statute and a longstanding agency practice.[11] The antidumping law itself does not define cost of production nor does it include a discussion of miscellaneous profit as an offset to cost. When a statute is silent or ambiguous, the court must defer to Commerce's reasonable interpretation. *Daewoo Elecs. Co., Ltd. v. Int'l Union of Electronic Elec., Technical, Salaried and Mach. Workers,* 6 F.3d at 1516.

However, Commerce's determination must also be supported by substantial evidence. Commerce failed to cite evidence in the Final Determination to support the notion that Siderca's miscellaneous sales were related to the production operations of the subject merchandise. Siderca's practice of including the costs related to these sales in its production

---

11. *See Saccharin from Korea,* 59 Fed.Reg. 58826, 58828 (Dep't Commerce 1994)(final det.)("[M]iscellaneous income should be permitted as an offset to G & A *because this income is related to [respondent's] production operations.")(emphasis added); *Polyethylene Terephthalate Film, Sheet, and Strip from the Republic of Korea,* 56 Fed.Reg. 16,305, 16,317 (Dep't Commerce 1991)(final det.)("[Respondent] did not establish during verification that its recorded miscellaneous income and expense amounts were related to the company's PET film production. We therefore excluded the net income amount from Cheil's general expenses.")

costs is not enough.[12]

In its memorandum to this Court, Defendant revised its statement of the legal standard for allowing offsets to general and administrative costs. Defendant argues that, "[i]t is Commerce's practice, ... to permit offsets to expenses for revenue relating to the respondent's general production operations." (Def.'s Mem. Opp'n. Mot. Siderca S.A.I.C. and Siderca Corp. and Partial Opp'n. Mot. U.S. Steel Group a Unit of USX Corp., et. al. J. Agency R. at 67). However, it is not clear to the Court that this is actually Commerce's usual practice. The three cases cited by Commerce involved offsetting interest expenses with interest income.[13] As petitioners note, interest income and expense are usually related to general production operations because the Department has reasoned that money is fungible.[14] Thus these cases are not relevant to the issue before the Court.

■ Furthermore, the legal standard articulated in Commerce's memorandum to the Court was not the same as that set out in the Final Determination. "Post-hoc rationalizations of agency actions first advocated by counsel in court may not serve as the basis for sustaining the agency's determination." *U.H.F.C. Co. v. United States*, 9 Fed. Cir. (T) 1, 13, 916 F.2d 689, 700 (1990) (citing *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168, 83 S.Ct. 239, 246, 9 L.Ed.2d 207 (1962); *Atcor, Inc. v. United States*, 11 CIT 148, 153, 658 F.Supp. 295, 299 (1987)).

Therefore, this issue is remanded so that Commerce can reconsider its treatment of Siderca's miscellaneous income.

### C. Adjustment of COP for Reintegro Tax Rebate

As explained above, the Argentine government imposes a series of indirect taxes at various stages of production, which become embedded in the price of the product at each stage and are passed on to the next stage of production through the price of the intermediate product. Under the reintegro program these taxes are rebated for merchandise produced for export. In calculating Siderca's cost of production, Commerce deducted the full amount of the rebate Siderca received for its sales to the PRC.

In response to plaintiffs' argument that Commerce should only deduct that part of the rebate attributable to taxes on material inputs of the subject merchandise, Commerce explained:

> the Department's Offices of Countervailing Investigations and Countervailing Compliance normally test to determine whether or not the reintegro is countervailable.... To be non-countervailable, the rebate must be for taxes on merchandise which was physically incorporated into the exported product and the rebate must be no greater than the actual taxes imposed.... In [1991], the Department determined that Siderca was entitled to the entire reintegro without incurring countervailing duties.

Final Determination at 33,546. The reimbursement percentage on OCTG was raised in 1992, but Siderca only accepts the pre–1992 rebate percentage on U.S. sales because the countervailing duty order is still in place. "Based on the fact that the Department has previously determined that Siderca was entitled to a rebate without incurring countervailing duties and because [Siderca] currently accepts a lower rebate, it is reasonable to assume that the entire reintegro is attributable only to material inputs." *Id.*

■ Commerce's explanation is insufficient. The tax rebate on exports to the United States was only 12.5 percent in 1989, the year for which Commerce determined that the rebate was not countervailable.

**12.** *See e.g. Certain Fresh Cut Flowers From Columbia*, 61 Fed.Reg. 42,833, 42,843 (Dept. of Comm. Aug. 19, 1996)(final det.)(refusing to allow revenues from cuttings, other materials, or sales of services to be used to offset constructed value).

**13.** The cases cited by Commerce were *Timken Co. v. United States*, 18 CIT 1, 852 F.Supp. 1040 (CIT 1994); *Floral Trade Council of Davis, Cal. v. United States*, 15 CIT 497, 775 F.Supp. 1492 (1991); and *NTN Bearing Corp. v. United States*, 905 F.Supp. 1083 (CIT 1995).

**14.** *See Certain Small Business Telephone Systems and Subassemblies Thereof from Korea*, 54 Fed. Reg. 53141, 49 (Dep't Commerce 1989) (final det.).

(Siderca's Mot. J. Agency R. at 9, n. 11). The subsidy on PRC exports is 15 percent. Therefore, it is not reasonable for Commerce to assume that the entire amount of the PRC rebate is attributable to material inputs. Furthermore, Siderca acknowledged that the reintegro rebates taxes on various cost elements other than material inputs. (Mem. P & A Def.-Ints. Siderca S.A.I.C. and Siderca Corp. Opp'n Pls.' Mot. J. Agency R. at 30).

Pursuant to Commerce's request, the Court is remanding this issue to give Commerce an opportunity to correct this error and to more plainly articulate its standard for adjusting Siderca's costs for the amount of the rebate received.

## CONCLUSION

For the reasons stated above, Commerce's determination is affirmed with respect to the circumstances of sale adjustment and the use of Siderca's allocated fixed costs in calculating Siderca's cost of production. Commerce's determination is remanded with respect to the treatment of miscellaneous income and the adjustment of Siderca's cost of production to account for the reintegro rebate.

## ORDER

This case having been duly submitted for decision and the Court, after due delibera-tion, having rendered a decision herein; now, in conformity with said decision, it is hereby

ORDERED that the Department of Commerce's final determination in *Oil Country Tubular Goods from Argentina*, 60 Fed.Reg. 33,539 (Dep't Commerce 1995) is sustained in part and remanded in part; and it is further

ORDERED that this case is remanded to the Department of Commerce, International Trade Administration to reconsider the treatment of revenue from miscellaneous sales as an offset to Siderca's general and administrative costs and to reconsider the adjustment of cost of production for the reintegro tax rebate; and it is further

ORDERED that remand results are due on Wednesday September 17, 1997; comments and responses are due on Tuesday October 21, 1997; any rebuttal comments are due on Wednesday November 5, 1997; and it is further

ORDERED that Commerce's final determination is sustained all other respects.

