U.S. STEEL GROUP A UNIT OF USX CORPORATION, USS/Kobe Steel Co., and Koppel Steel Corp., Plaintiffs,

v.

UNITED STATES, Defendant,

Siderca S.A.I.C. and Siderca Corporation, Defendant–Intervenors.

Slip Op. 98–17.
Court No. 95–09–01144.

United States Court of International Trade.

Feb. 25, 1998.

Skadden, Arps, Slate, Meagher & Flom (Robert E. Lighthizer, John J. Mangan), Washington, DC, for U.S. Steel Group a Unit of USX Corp., USS/Kobe Steel Co., and Koppel Steel Corp.

Schagrin Associates (Roger B. Schagrin, R. Alan Luberda), Washington, DC, for Maverick Tube.

Wiley, Rein & Fielding (Charles Owen Verrill, John R. Shane), Washington, DC, for North Star Steel.

Frank W. Hunger, Asst. Atty. Gen.; David M. Cohen, Director; Velta A. Melnbrencis, Asst. Director, Dept. of Justice, Civil Division, Commercial Litigation Branch; Barbara Campbell–Potter, Attorney–Advisor, Office of Chief Counsel for Import Administration, Dept. of Commerce, Washington, DC, for Defendant.

White & Case (David P. Houlihan, Gregory J. Spak, Christopher M. Curran, Richard J. Burke), Washington, DC, for Siderca S.A.I.C. and Siderca Corp.

## OPINION

POGUE, Judge:

On July 14, 1997, this Court remanded certain aspects of the International Trade Administration's final determination in *Oil Country Tubular Goods from Argentina*, 60 Fed.Reg. 33,539 (Dep't Commerce 1995)(final det.) ("Final Determination"). *U.S. Steel Group v. United States*, 973 F.Supp. 1076 (CIT 1997)("*U.S.Steel* ").[1]

The remand Order directed Commerce to reconsider its treatment of miscellaneous income as an offset to respondent Siderca's general and administrative costs ("G & A") and the adjustment of Siderca's cost of production ("COP") to account for the reintegro tax rebate. Petitioners U.S. Steel Group A Unit of USX Corp., USS/Kobe Steel Co. and

---

1. Familiarity with the Court's earlier decision in this case is presumed.

Koppel Steel Corp. ("petitioners" or "U.S. Steel") object to Commerce's remand determination.

## Discussion

### I. Miscellaneous Income Offset to G & A Expenses

■ In calculating Siderca's COP, the Department's calculation of general and administrative expenses included an offset for "miscellaneous income" comprised of revenues from: (1) sales of technical assistance to other steel companies; (2) sales of tubes purchased from other countries and resold in other countries; and (3) sales of intermediate products. Final Results Redet. Pursuant Crt. Remand at 1 ("Remand Determination").

In the Final Determination, Commerce explained its decision to allow the offsets, stating, "miscellaneous income relating to production operations of the subject merchandise may be permitted as an offset to G & A." The Court found Commerce's statement to be a permissible construction of the statute. *See U.S. Steel,* 973 F.Supp. at 1088 ("The antidumping law ... does not define cost of production nor does it include a discussion of miscellaneous profit as an offset to cost. When a statute is silent or ambiguous, the court must defer to Commerce's reasonable interpretation.")(citing *Daewoo Electronics Co., Ltd. v. Int'l Union of Elec., Technical, Salaried and Mach. Workers,* 6 F.3d 1511, 1516 (Fed.Cir.1993)).

In its brief to this Court, Commerce revised its statement of the legal standard for permitting offsets to G & A, arguing that "[it] is Commerce's practice, ... to permit offsets to expenses for revenue relating to the respondent's general production operations." (Def.'s Mem. Opp'n. Mot. Siderca S.A.I.C. and Siderca Corp. and Partial Opp'n. Mot. U.S. Steel Group a Unit of USX Corp. et. al. J. Agency R. at 67). The Court rejected Commerce's revision as a post hoc rationalization by agency counsel. *U.S. Steel,* 973 F.Supp. at 1089. The Court also found that Commerce had failed to cite evidence to support its conclusion that the miscellaneous income was related to the production operations of the subject merchandise. Therefore, the Court remanded, asking that

Commerce reconsider its treatment of Siderca's miscellaneous income.

In the Remand Determination, Commerce explained,

the standard described in the *Final Determination* ... *i.e.,* that the miscellaneous income items at issue be related to production of *the subject merchandise,* does not accurately reflect the appropriate criteria for analyzing whether such items should be included in our calculation of G & A for Siderca.... [W]here these or other items of expense or income bear a close relationship to production of the subject merchandise, they may be more accurately accounted for as part of the COM [cost of manufacture] of that merchandise. On the other hand, where, ... items of income and expense are most closely related to the general operations of the company (all general activities associated with the company's core business), it is appropriate to treat those items as part of G & A....

Remand Determination at 5. After calculating a company's total G & A expenses, Commerce allocates a portion of those expenses to the subject merchandise. In allocating G & A, Commerce calculates a "G & A rate" by dividing the company's G & A expenses by the total cost of manufacture of all products sold. This rate is then multiplied by the per-unit cost of manufacture of a product in order to derive the portion of total G & A to be allocated to that product. Remand Determination at 5. An offset to G & A would be allocated similarly.

Petitioners argue that the standard articulated by Commerce in the Remand Determination is inconsistent with the statute. "The statute unambiguously requires that the cost of production to be used in an antidumping case is 'the cost of producing the merchandise in question ...'" Comments of U.S. Steel Group a Unit of USX Corp., USS/Kobe Steel Co., and Koppel Steel Corp. on the Final Results of Redetermination Pursuant to Court Remand at 7–8 ("U.S. Steel Comments") (citing 19 U.S.C. § 1677b(b)(1994)).

Commerce contends that limiting offsets to G & A expenses to income from activities related to "production of the subject mer-

chandise" would be inconsistent with the accounting allocation concept of G & A expenses.

▮ Commerce's argument is persuasive. "G & A expenses are those expenses which relate to the activities of the company as a whole rather than to production process." *Rautaruukki Oy v. United States*, 1995 WL 170399, Slip Op. No. 95–56 (CIT March 31, 1995). Commerce's decision that offsets to G & A expenses should also be related to the company's general operations—comprised of all general activities associated with the company's core business, including production of the subject merchandise—is a reasonable application of the statute.

### 1. Sales of Technical Assistance

▮ Petitioners argue that revenues from Siderca's sales of technical assistance to other steel companies should not be used to offset Siderca's G & A expenses because these sales constitute "a distinct and separate activity for Siderca."

Commerce argues, on the other hand, that miscellaneous technical assistance provided to other companies relates to Siderca's general production activities because the primary function of the personnel providing these services is to provide in-house production assistance and technical services to Siderca's own steel goods customers.

In response, petitioners state that "there is no record evidence to show that the personnel who provide technical assistance to other steel companies are in fact the same individuals who provide technical services to OCTG [oil country tubular goods] customers." U.S. Steel Comments at 12.

The Court finds Commerce acted appropriately in accepting Siderca's characterization of these sales.

Siderca describes these sales as an incidental accessory to its core production activities and treats them that way in its accounting records.[2] *See* Cost Verification Report Ex. 20. The relative insignificance of this account supports this characterization as does the nature of the activity at issue. Because a manufacturing company such as Siderca would be expected to employ a corps of technical staff to support its manufacturing activities, it was reasonable for Commerce to accept Siderca's representation that the personnel providing technical assistance to other companies were primarily employed to provide in-house support for Siderca's core production activities and assistance to Siderca's OCTG customers.

▮ Furthermore, given the relative insignificance of this account, Commerce's acceptance of Siderca's description without further verification was appropriate. "Commerce is not required to examine in detail every aspect of a respondent's questionnaire." *PMC Specialties Group, Inc. v. United States*, 1996 WL 497155, Slip Op. 96–153 (CIT Aug. 30, 1996).

> Verification is like an audit, the purpose of which is to test information provided by a party for accuracy and completeness. Normally, an audit entails selective examination rather than testing of an entire universe. Hence, evasion is a common possibility, but only when audits uncover facts indicating the actuality thereof are auditors compelled to search further.

*Bomont Industries v. United States*, 14 CIT 208, 209–210, 733 F.Supp. 1507, 1508 (1990). Here, Commerce uncovered no facts to indicate that Siderca's reporting was improper or evasive. Therefore, the Court finds, Commerce's acceptance of Siderca's description of this activity was appropriate, and its decision to include this item as an offset to G & A was supported by substantial evidence.

---

**2.** In its underlying opinion in this case, the Court stated that Siderca's treatment of the costs related to its miscellaneous sales in its accounting records did not constitute sufficient evidence to support Commerce's decision to use the revenue from these sales to offset G & A costs. *U.S. Steel,* 973 F.Supp. at 1088. However, in that case, the Court was relying on Commerce's assertion that income related to production *of the subject mer-*

*chandise* could be used to offset general and administrative costs. The inclusion of these items in Siderca's miscellaneous sales account did not support the notion that these items were related to the production of the subject merchandise. However, it does lend support to Commerce's decision that they should not be treated as separate and distinct from Siderca's general production activities.

### 2. Sales of Tubes Purchased in Third Countries and Exported to Other Countries

Petitioners argue that Siderca's sales of tubes purchased from third countries and then resold to other countries constituted a separate and distinct business activity and that the revenues from this activity should not have been used to offset Siderca's G & A expenses.

Both Commerce and Siderca acknowledge that confusion exists as to the nature of these tubes. Prior to and during verification they were simply described as purchased tubes, while in Siderca's case brief, submitted after verification, they are described as purchased OCTG. Commerce explains in the Remand Determination that "[b]ecause a pipe manufacturer may use tubes for maintenance on its facilities or as a raw material in making the subject merchandise, we concluded that the disposal of such items was a normal G & A activity for a pipe manufacturer.". Remand Determination at 9.

In response, domestic producers argue, "[t]here is not a single shred of evidence on the record that Siderca used these tubes for any such purposes." U.S. Steel Comments at 16–17.

Again, however, the Court finds Commerce acted within its discretion in accepting Siderca's characterization of this activity as ancillary to its core manufacturing activities. Like Siderca's sales of technical assistance, these sales were included in Siderca's miscellaneous sales account. They were not treated as a separate line of business in Siderca's accounting records.

■ Furthermore, Commerce explained that, "the small value in this account in itself demonstrates that it is neither a major line of business for Siderca nor a significant financial transaction...." Remand Determination at 10. Although the size of the account is not dispositive as to the issue of whether the activity is related to Siderca's core production activity, the Department has the dis-

cretion to consider this a factor in evaluating the nature of the activity.

Finally, this activity, like sales of technical assistance could reasonably be considered to be related to Siderca's core manufacturing activities.

### 3. Sales of Intermediate Products

■ Petitioners do not dispute that Siderca's production and sale of intermediate products, such as sponge iron and bar, are connected to Siderca's general production operations. However, petitioners argue, the income offset to G & A was improper because the record fails to establish whether the costs relating to the production and sale of the intermediate products were included in the cost of manufacturing or in general expenses. U.S. Steel Comments at 17–18. "Where the costs for an activity are in COM or cost of goods sold ["COGS"], then the revenues generated by the activity must be applied to reduce the COGS...." *Id.* at 18–19.

In its response, Commerce states that "[t]he costs associated with these miscellaneous sales are not included in the COGS account, but are recorded in the other income and expense account." Remand Determination at 26. As evidence for this statement, Commerce provided the Court with excerpts from Siderca's Cost Verification. Cost Verification Report Ex. 20. This document demonstrates that Siderca's "Ventas Diversas," or miscellaneous sales sub-account, which is contained within the "other income and expense account" is comprised of eight line items including "Barras" (bars), "Hierro esponja" (sponge iron) and "Costo Vtas Diversas" (cost of miscellaneous sales).

The Court finds this document constitutes substantial evidence to support Commerce's finding that the costs associated with Siderca's sales of intermediate products are included in its general expenses account, along with the revenues from those sales.[3] Com-

---

**3.** U.S. Steel also argues that in the final determination, Commerce stated that the costs for intermediate products were captured in Siderca's overall variance, i.e., in the cost of manufacturing. Furthermore, U.S. Steel notes, Siderca

has gone back and forth regarding the question of how these costs were treated in Siderca's accounting records. For that reason, U.S. Steel argues, "there is no substantial evidence on record to show where these costs have been cap-

merce was not required to take further steps to verify Siderca's assertion that the costs contained in the "Costos Vtas Diversas" line related to the sales at issue here. *See* discussion *supra* section I.1.

U.S. Steel also argues that if the Court concludes that the costs are included in the miscellaneous account, then the offset must still be denied because the costs are included in the basket category Costo Ventas Diversas. This category includes the costs of the intermediate products as well as costs associated with Siderca's buying and reselling of tubes in third countries. Response of U.S. Steel Group a Unit of USX Corp., USS/Kobe Steel Co., and Koppel Steel Corp. Court's Dec. 23, 1997 Order at 1. "In order to calculate the offset relating to intermediate products," U.S. Steel maintains, "the Department of Commerce ... must determine the net profit derived from such sales (*i.e.*, revenues minus cost). The Department cannot perform such a calculation here because the costs for the intermediate products are aggregated with those for the brokering of tubes." *Id.* at 1–2.

The Court does not agree. Although Commerce may not be able to calculate profits for individual items within Siderca's miscellaneous sales subaccount, the revenue and expense information does permit calculation of net revenue for the subaccount as a whole. Because the Court has concluded that all three categories of revenue (purchased tubes, intermediate products and technical assistance) are appropriate as offsets, Commerce can simply subtract the total expenses from the total revenues to arrive at an appropriate figure to be used for miscellaneous income.

## II. Deduction of Siderca's Indirect Tax Rebate from COP

■ The Government of Argentina has adopted a cumulative, indirect tax system pursuant to which certain indirect taxes are imposed at various stages of production, become embedded in the price of the product at those stages, and are passed on to the next stage through the price of the intermediate product. The Government of Argentina also has a tax rebate program (the reintegro program), which provides for government rebate, upon export, of indirect taxes imposed and embedded in the price of the finished product.

In calculating Siderca's cost of production for its Final Determination, Commerce deducted the full amount of the rebate Siderca received for its sales to the People's Republic of China.[4] Petitioners argued that Commerce should only deduct that part of the rebate attributable to taxes on material inputs of the subject merchandise. In response, Commerce stated, "[t]o be non-countervailable, the rebate must be for taxes on merchandise which was physically incorporated into the exported product and the rebate must be no greater than the actual taxes imposed." Final Determination at 33,546. Commerce added, "[b]ased on the fact that the Department has previously determined that Siderca was entitled to a rebate without incurring countervailing duties and because [Siderca] currently accepts a lower rebate, it is reasonable to assume that the entire reintegro is attributable only to material inputs." *Id.*

In its brief, however, Siderca acknowledged that the reintegro rebates taxes on various cost elements other than material inputs. (Mem. P & A Def.-Ints. Siderca S.A.I.C. and Siderca Corp. Opp'n. Pls.' Mot. J. Agency R. at 30). Therefore, pursuant to Commerce's request, the Court remanded this issue to give Commerce the opportunity to correct its error.

In its Remand Determination, Commerce agrees with Siderca that "[t]he amount of taxes rebated on sales to third countries is attributable to a wide range of taxes embed-

---

tured," U.S. Steel Comments at 23. Although U.S. Steel is correct, that both Commerce and Siderca have equivocated over this question, that does not change the fact that in the remand determination at issue here, Commerce had substantial evidence to support its position.

4. During the course of its investigation, Commerce determined that Siderca's home market (Argentine) sales were not viable during the period of investigation and therefore based foreign market value upon sales of OCTG to the People's Republic of China, pursuant to 19 U.S.C. § 1677b(a)(1)(B). *See U.S. Steel,* 973 F.Supp. at 1079.

ded in each element of Siderca's COP (*i.e.*, materials, labor, factory overhead, and G & A expenses)." Remand Determination at 11. However, both Commerce and Siderca also agree that the legal standard articulated by the Department in the Final Determination was incorrect and that "a fair comparison [between cost of production and price] requires that, when performing the cost test on [the People's Republic of China] sales, all of the refunded taxes be deducted from the COP." Remand Determination at 13.

Petitioners argue that the legal standard articulated in the Final Determination was correct, that the statutory definition of constructed value permits the deduction of only those tax rebates attributable to material inputs, and that the same standard applies when the department is calculating cost of production. Constructed value is defined as follows:

> [T]he constructed value of imported merchandise shall be the sum of—
>
> (A) the cost of materials (exclusive of any internal tax applicable in the country of exportation directly to such materials or their disposition, but remitted or refunded upon the exportation of the article in the production of which such materials are used) and of fabrication or other processing of any kind employed in producing such or similar merchandise....

19 U.S.C. § 1677b(e)(1).

Petitioners argument is based on the maxim *expressio unius est exclusio alterius,* "where Congress ... has carefully employed a term in one place and excluded it in another, it should not be implied where excluded." *Old Republic Ins. Co. v. United States,* 10 CIT 589, 595, 645 F.Supp. 943, 949 (1986) (citing *Marshall v. Western Union Tel. Co.,* 621 F.2d 1246, 1251 (3d Cir.1980)). Specifically, petitioners argue that because Congress explicitly excluded rebated taxes paid on material inputs from the calculation of constructed value, rebated taxes paid on non-material inputs should not be excluded.

Commerce maintains that "the existence of [a] phrase, explicitly providing for the exclusion of one group of commonly-incurred internal taxes ... does not prohibit us from recognizing instances where other internal taxes are rebated and, thus, are not an actual cost to the respondent." [5]

The court, in reviewing Commerce's construction of the statute, follows a two-step process. In the first step, the court must look to whether Congress has directly spoken on the issue. *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984). "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 843. The court reaches the second step if it finds the statute to be silent or ambiguous. If so, "the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843, 104 S.Ct. at 2782.

A good deal of confusion exists over the principles a court should apply in attempting to determine legislative intent for purposes of *Chevron* step one. *See INS v. Cardoza–Fonseca,* 480 U.S. 421, 454, 107 S.Ct. 1207, 1225, 94 L.Ed.2d 434 (1987) (Scalia, J. dissenting) ("The Court ... implies that courts may substitute their interpretation of a statute for that of an agency whenever, '[e]mploying traditional tools of statutory construction,' they are able to reach a conclusion as to the proper interpretation of the statute.... But this approach would make deference a doctrine of desperation, authorizing courts to defer only if they would otherwise be unable to construe the enactment at issue."); *see also* Davis and Pierce, I *Administrative Law Treatise* § 3.6 (3d ed. 1994) ("This brief digression on the widely differing ways in which the Justices define and apply 'traditional tools of statutory construction' helps to highlight the importance of the as yet unresolved debate among the Justices concerning the meaning of the *Chevron* test.

**5.** Commerce also disputes petitioners' contention that the constructed value provision is applicable to calculation of cost of production. Because the Court rejects petitioners' interpretation of the constructed value provision, the Court need not reach the question whether the same standard applies to both constructed value and cost of production.

If reviewing courts are free to use any combination of the 'traditional tools of statutory construction' they choose in the process of applying *Chevron* step one, few if any cases will reach *Chevron* step two. It is the very indeterminacy of the 'traditional tools' that gives judges the discretion to make policy decisions through the process of statutory construction.")

The use of the *expressio* maxim is particularly controversial. As the court noted in *Caterpillar Inc. v. United States,* 941 F.Supp. 1241 (CIT 1996), *appeal dismissed per stipulation* 111 F.3d 143 (Fed.Cir.1997), "[t]he Supreme Court itself impugned the canon when it nodded approvingly to a law review article which 'recogniz[ed] that the principle *expressio unius est exclusio alterius* is a questionable one in light of the dubious reliability of inferring specific intent from silence.'" *Pauley v. BethEnergy Mines, Inc.,* 501 U.S. 680, 703, 111 S.Ct. 2524, 2537–38, 115 L.Ed.2d 604 (1991) (quoting Cass R. Sunstein, *Law and Administration After Chevron,* 90 Colum. L.Rev.2071, 2109, n. 182 (1990)). *See also Cheney R.R. Co. v. I.C.C.,* 902 F.2d 66 (D.C.Cir.1990) ("Scholars have long savaged the expressio canon.... Whatever its general force, we think it an especially feeble helper in an administrative setting, where Congress is presumed to have left to reasonable agency discretion questions that it has not directly resolved.").

U.S. Steel cites *King v. Briggs,* 83 F.3d 1384 (Fed.Cir.1996), as an example of a case in which a court relied on the *expressio* maxim within the context of a *Chevron* analysis. *See* Response of U.S. Steel Group a Unit of USX Corp., USS/Kobe Steel Co., and Koppel Steel Corp. Court's Dec. 23, 1997

Order at 3. In fact, however, *Briggs* did not involve a *Chevron* analysis. The question in *Briggs* involved the jurisdiction of the Merit Systems Protection Board, "a question of law," the court said, "that we review de novo." [6]

The *Briggs* court applied the *expressio* maxim to the provision at issue only after concluding that the resulting interpretation would be consistent with parallel employment provisions within the U.S.Code. Thus, the Court is not convinced that the outcome in *Briggs* supports the use of the *expressio* maxim in this case. Instead, the Court finds that the case at hand is more similar to *Daewoo Electronics Co., Ltd. v. Int'l Union Elec. Technical, Salaried and Machine Workers,* 6 F.3d 1511 (Fed.Cir.1993) than to *Briggs.* In *Daewoo,* the court considered a provision of the antidumping statute that provides for an assessment "cap" when estimated duties are paid in cash. The statute is silent as to the treatment of estimated duties paid with bonds. The court, carrying out a *Chevron* analysis, declined to apply the *expressio* maxim and instead deferred to Commerce's interpretation that the cap should also apply to bond deposits. "This provision simply does not speak to whether estimated duty bonds cap antidumping duties. Given this silence ... we cannot say that the ITA's allowance of a duty ceiling for bonds is contrary to the statute." *Daewoo* at 1521.

Similarly, in this case, the provision does not speak to whether rebated indirect taxes paid on non-material inputs may be excluded from constructed value. Given this silence, the Court can not find that U.S. Steel's interpretation represents "the unambiguously expressed intent of Congress," required under *Chevron* step one. The provision at issue is

**6.** The issue in *Briggs* was whether a federal employee who had been exempted by statute from certain specific protections contained in the Civil Service Reform Act of 1978 (CSRA) was also exempt from other unspecified protections. Specifically, the question in *Briggs* was whether the employee was entitled to a hearing before the Merit Systems Protection Board after being removed from her position.

In answering this question, the court interpreted a statutory provision governing the conditions of Briggs' employment. The court compared the provision to a similar provision which explicitly

exempted a federal employee from the section of the CSRA at issue in *Briggs.* Based on this comparison, the court concluded that "[t]o interpret the section as giving the Council the option to disregard additional, unenumerated parts of [the CSRA] would run afoul of the maxim '*expressio unius est exclusio alterius,*' and in a domain where, ... Congress knows how to exempt a civil service position from the protections ... if it so desires." *Briggs,* 83 F.3d at 1388 (citing *Todd v. Merit Systems Protection Board,* 55 F.3d 1574 (Fed.Cir.1995)).

not one in which "that which is expressed is so set over by way of strong contrast to that which is omitted that that which is omitted must be intended to have opposite and contrary treatment." *See Ford v. United States,* 273 U.S. 593, 611, 47 S.Ct. 531, 537, 71 L.Ed. 793 (1927). Thus, the Court finds the statute to be sufficiently ambiguous to require deference to Commerce's interpretation, if that interpretation is reasonable.

Commerce's methodology represents a reasonable attempt to comply with the statutory mandate to rely on actual costs in calculating cost of production, *see IPSCO, Inc. v. United States,* 965 F.2d 1056, 1059 (Fed.Cir. 1992) ("By its terms, the statute expressly covers actual production costs."), as well as the mandate to "determine current margins as accurately as possible." *Rhone Poulenc, Inc. v. United States,* 899 F.2d 1185, 1191, 8 Fed. Cir. (T) 61, 67 (1990). Commerce explained, "we found that, on its sales to the PRC, Siderca received back a portion of the total direct and indirect taxes that are included in its reported COPs.... Therefore, we reduced Siderca's costs by that same amount. This enabled us to calculate an accurate COP that reflected Siderca's actual costs related to its sales to the PRC." Remand Determination at 13.

Commerce's interpretation here was consistent with Congressional intent concerning the goals of the antidumping regime and therefore represents a permissible construction of the statute.

## CONCLUSION

For the reasons stated above, Commerce's Remand Determination in *U.S. Steel Group A Unit of USX Corporation, et al. v. United States,* 973 F.Supp. 1076 (1997) is affirmed.

## ORDER

This case having been duly submitted for decision and the Court, after due deliberation, having rendered a decision herein; now, in conformity with said decision, it is hereby

ORDERED that the Department of Commerce's Final Results of Redetermination pursuant to court remand in *U.S. Steel Group v. United States,* 973 F.Supp. 1076 (CIT 1997) is sustained in its entirety.

