**E.I. DUPONT DE NEMOURS & COMPANY, Hoechst Celanese Corporation and ICI Americas Inc., Plaintiffs,**

v.

**UNITED STATES, Defendant,**

SKC Limited and SKC America, Inc.; Cheil Synthetics, Inc. and Samsung America, Inc.; STC Corporation, STC of America, Inc. and American Tape Company; Kolon Industries, Inc., Defendant–Intervenors.

Slip Op. 98–35.
Court No. 95–09–01216.

United States Court of International Trade.

March 26, 1998.

Wilmer, Cutler & Pickering (John D. Greenwald) and Howry & Simon (Michael A. Hertzberg, Matthew J. Clark, Maria Tan Pedersen and F. Alexander Amrein), Washington, DC, for Plaintiffs.

Frank W. Hunger, Asst. Atty. Gen.; David M. Cohen, Director, Commercial Litigation Branch, Civil Div., U.S. Dept. of Justice; Velta A. Melnbrencis, Asst. Director (Lance J. Lerman ); of counsel: Karen L. Bland, Attorney–Advisor, Office of Chief Counsel for Import Admin., U.S. Dept. of Commerce, Washington, DC, Washington, DC, for Defendant.

Akin, Gump, Strauss, Hauer & Feld, L.L.P. (Warren E. Connelly and Katherine M. Ho), Washington, DC, for Defendant–Intervenors, Cheil Synthetics, Inc. and Samsung America, Inc.

Kaye, Scholer, Fierman, Hays & Handler, LLP (Michael P. House, R. Will Planert and Stephen E. Lebowitz), Washington, DC, for Defendant–Intervenors, SKC Ltd. and SKC America, Inc.

Shearman & Sterling (Jeffrey M. Winton ),Washington, DC, for Defendant–Intervenor, Kolon Industries, Inc.

## OPINION

TSOUCALAS, Senior Judge:

Plaintiffs, E.I. DuPont de Nemours & Company, Hoechst Celanese Corporation and ICI Americas Inc. (collectively "DuPont"), move for judgment on the agency record pursuant to Rule 56.2 of the Rules of this Court. DuPont challenges the Department of Commerce, International Trade Administration's ("Commerce") final results of the administrative review, entitled *Polyethylene Terephthalate Film, Sheet, and Strip From the Republic of Korea; Final Results of Antidumping Duty Administrative Review* ("*Final Results* "), 60 Fed.Reg. 42,835 (Aug. 17, 1995), *as amended,* 61 Fed.Reg. 5375 (Feb. 12, 1996).

### Background

On June 5, 1991, pursuant to an affirmative final determination of sales at less than fair value ("LTFV") and an affirmative final determination of material injury, Commerce issued an antidumping duty order encompassing all entries of Polyethylene Terephthalate ("PET") film from Korea. *See Antidumping Duty Order and Amendment to Final Determination of Sales at Less Than Fair Value: Polyethylene Terephthalate Film, Sheet, and Strip From the Republic of Korea,* 56 Fed. Reg. 25,669. Commerce subsequently initiated an administrative review of PET film for the period covering November 30, 1990, through May 31, 1992.[1] *See Initiation of Antidumping and Countervailing Duty Administrative Reviews,* 57 Fed.Reg. 32,521 (July 22, 1992). Commerce published the preliminary results of the first administrative review on July 8, 1994. *See Polyethylene Terephthalate Film, Sheet, and Strip From the Republic of Korea; Preliminary Results of Antidumping Duty Administrative Review* ("*Preliminary Results* "), 59 Fed.Reg. 35,098. On August 17, 1995, Commerce published the Final Results at issue. *See* 60 Fed.Reg. at 42,835.

---

**1.** In the preliminary LTFV results, Commerce determined that Cheil had a *de minimus* margin,

and so, the first review period with respect to Cheil began on April 22, 1991.

In light of the Court of Appeals for the Federal Circuit's ("CAFC") decision in *IP-SCO, Inc. v. United States,* 965 F.2d 1056 (Fed.Cir.1992), this court remanded to Commerce certain aspects of the LTFV investigation. *See E.I. DuPont de Nemours & Co. v. United States,* 17 CIT 1266, 841 F.Supp. 1237 (1993). On March 20, 1996, the court issued a ruling on the remand redetermination of the LTFV investigation. *See E.I. DuPont de Nemours & Co. v. United States,* 20 CIT ——, 932 F.Supp. 296 (1996). In that case, the court affirmed Commerce's remand redetermination with respect to Cheil's and SKC's cost methodologies for recycled PET material, Cheil's and SKC's cost methodologies for prime and off-grade PET film and SKC's product-specific costs. *See id.*

DuPont now claims Commerce erred in the Final Results by: (1) accepting the value-based costing methodologies utilized by Cheil Synthetics, Inc. ("Cheil") and SKC Limited and SKC America, Inc. (collectively "SKC") to calculate the material costs of recycled PET material; (2) accepting SKC's methodology for calculating the production costs of off-grade PET film; (3) accepting SKC's product-specific cost data; (4) determining that there was no evidence in the record that SKC manipulated roll film pricing on its United States sales to Anacomp, Inc. ("Anacomp"); (5) accepting inventory carrying costs as reported by Kolon Industries, Inc. ("Kolon"); (6) calculating an imputed credit expense based on the short-term interest rate as reported by SKC; and (7) deciding to account for non-customary inventory carrying costs incurred by Cheil in the home market on its United States sales.

### Discussion

The Court has jurisdiction over this matter under 19 U.S.C. § 1516a(a)(2) (1994) and 28 U.S.C. § 1581(c) (1994).

The Court must uphold Commerce's final determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

*Universal Camera Corp. v. NLRB,* 340 U.S. 474, 477, 71 S.Ct. 456, 95 L.Ed. 456 (1951) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)). "It is not within the Court's domain either to weigh the adequate quality or quantity of the evidence for sufficiency or to reject a finding on grounds of a differing interpretation of the record." *Timken Co. v. United States,* 12 CIT 955, 962, 699 F.Supp. 300, 306 (1988), *aff'd,* 894 F.2d 385 (Fed.Cir. 1990).

1. *Acceptance of Cheil's and SKC's Costing Methodologies for Recycled PET Film*

In calculating the cost of production ("COP") and constructed value ("CV") of the PET film, Commerce accepted the cost data reported by Cheil and SKC, concluding that both methodologies reasonably calculated the material costs of recycled material. *See Final Results,* 60 Fed.Reg. at 42,836. PET film is manufactured in a two-stage process that ultimately combines virgin and recycled PET chips in different combinations to produce different types of PET film. In the first stage, raw materials of ethylene glycol, dimethyl terephthalate and terephthalate acid are combined to produce virgin polyester chips from polymerization. In the second stage, the virgin chips are melted down and extruded through a dye and rolled out on rollers to produce finished PET film. The production of PET film from chips features a first pass efficiency, *i.e.,* a percentage of good, salable finished film from each production run, of between 50% and 80% of the volume of input material. Cheil and SKC both recycle the PET material edge trimmings and scrap resulting from the production process into chips and combine them with virgin material to manufacture film of the same or lower specification in subsequent runs. As very little PET polymer degrades during production, over 90% of the total volume of raw material introduced into the production process ultimately emerges as finished PET film.

Cheil and SKC both calculate material costs utilizing valuebased methodologies to account for the recycled PET material. Cheil employs a figure representing the po-

tential resale value of a recycled chip, known as a "net realizable value" ("NRV"). To arrive at its total materials cost for each run, Cheil adds the cost of the virgin material to the NRV of the chip input and subtracts the NRV of the chips produced. In contrast, SKC assigns a cost to its transferred recycled PET equal to the processing cost involved in recovering and recycling the scrap material into chips and treats the recycled material as having a zero materials cost. In essence, from a materials cost standpoint, SKC assigns a zero value for recycled PET transferred to the receiving film, but includes the cost of processing the edge trimmings into recycled PET. *See Final Results,* 60 Fed.Reg. at 42,836. Cheil includes this processing cost in its film fabrication costs.

DuPont claims Cheil's and SKC's methodologies attribute a value to recycled PET that is far below the cost of virgin PET, for which it is substitutable, hence resulting in a cost figure unrepresentative of actual cost. DuPont argues that the end result of defendant-intervenors' methodologies is the shifting of costs from films sold in the United States to films sold in Korea when material is transferred. In essence, DuPont maintains that a distinction can be made between films that both Cheil and SKC manufacture: those that generate recycled PET and those that consume recycled PET. According to DuPont, as consuming films are predominantly sold in the United States and generating films are predominantly sold in Korea, Cheil's and SKC's inaccurate accounts for costs succeed in shifting costs away from the films principally involved in the review, thus systematically understating COP and CV. DuPont's Mem. Supp. Mot. J. Agency R. at 24–53.

Commerce first responds that it need not apply the cost methodology mandated by the CAFC in *IPSCO,* as that case applies solely to co-products and the recycled chips in this case are by-products of the PET film production process. Commerce further reiterates its conclusion in the Final Results that both methodologies at issue reasonably reflect the actual cost of producing PET film. Nevertheless, Commerce acknowledges the potential merit of DuPont's cost-shifting claims and commits to specifically investigate this allegation in subsequent reviews. Def.'s Partial Opp'n to Mot. J. Agency R. at 23–34. Cheil and SKC agree generally with the position taken by Commerce. Cheil's Opp'n to Mot. J. Agency R. at 14–33; SKC's Opp'n to Mot. J. Agency R. at 7–14.

The edge trimmings and other scrap materials that comprise the recycled PET chips at issue are neither finished goods nor co-products of the PET film; rather, they are by-products of the PET film manufacturing process. *See, e.g.,* E. Kohler, A Dictionary for Accountants 70 (4th ed.1970) (stating that production would not be carried out for the sake of by-products, as they are incidental to, and of relatively small importance in, the production of the main product). As the court stated in *E.I. DuPont,* "[t]he recycling process does not disinvest the recycled material from its by-product character, regardless of whether the recycled product hypothetically could be sold on the open market." 20 CIT at ——, 932 F.Supp. at 302. That being said, it is equally evident that the CAFC's decision in *IPSCO* requiring that all components be valued in a manner that fully comprehends production costs is limited to the value of co-products, and not by-products. *See IPSCO,* 965 F.2d at 1060; *see also Thai Pineapple Pub. Co. v. United States,* 20 CIT ——, ——, 946 F.Supp. 11, 18 n. 5 (1996) (stating that, because no party had argued that the merchandise at issue was a by-product, the court applied a co-product methodology for allocation of joint costs); *Asociacion Colombiana de Exportadores de Flores,* 22 CIT ——, ——, 6 F.Supp.2d 865, 881–82 (1998). *IPSCO,* therefore, does not apply to the valuation of the recycled PET material at issue here.

The evidence in this case demonstrates that recycled PET material is not entirely substitutable with virgin material. *See, e.g., SKC's Administrative Rebuttal Brief,* P.R. Doc. No. 231, at 8 n. 6, SKC's App., Ex. 2 (Aug. 24, 1994) (noting that chips with higher recycled chip content are cheaper to produce because they require fewer high-quality virgin chips); *Administrative Hearing Transcript,* P.R. Doc. No. 238, at 78–82, SKC's

App., Ex. 6 (Sept. 2, 1994) (same). It is, therefore, inappropriate to require respondents to base their materials costs of recycled PET on the market value of equivalent volumes of virgin PET.

Further, as the court held in the appeal of Commerce's LTFV determination, Cheil's and SKC's methodologies reasonably capture the value of recycled PET chips re-introduced into the production process. *See E.I. DuPont,* 20 CIT at ——, 932 F.Supp. at 300–01.[2] Cheil's accounting methodology maintains the necessary equilibrium in COP by adding the NRV of transferred recycled PET chips while subtracting the NRV of the chips created from the production run. *See id.* Further, this methodology is consistent with both Korean and United States generally accepted accounting principles. SKC's zero value method is also reasonable, as it fully accounts for the cost of producing the recycled PET chips. Moreover, although SKC assigns a zero value to recycled PET chips, SKC does not subtract the value of recycled chips from the cost of producing film. Hence, there is no basis for adding any recycled chip value back into the cost of film manufactured with chip material input. *See E.I. DuPont,* 20 CIT at ——, 932 F.Supp. at 301.

Consequently, the Court concludes that Commerce properly accepted the costing methodologies utilized by Cheil and SKC to calculate the materials costs of recycled PET material. As a final note, however, the Court recognizes the cost-shifting potential inherent in Cheil's and SKC's methodologies because of the relatively high percentage of recycled material used in U.S. destined merchandise compared to Korea-destined merchandise. While there is no evidence of such shifting here, Commerce should commit to investigate specifically this allegation in subsequent reviews.

2. *SKC's Cost Accounting Methodology for Off–Grade Film*

■ Commerce accepted SKC's methodology for calculating the production costs of off-grade PET film because it was satisfied that SKC properly calculated these costs in a manner consistent with the CAFC's *IPSCO* decision. *See Final Results,* 60 Fed.Reg. at 42,840.

DuPont challenges Commerce's acceptance of SKC's off-grade PET film production cost methodology, arguing that record evidence indicates that SKC did not report identical costs for prime and off-grade film produced in the same production run as required by *IPSCO.* In particular, DuPont alleges that SKC obscured the link between prime and off-grade film by designating the different types of off-grade film in such a way that they had no prime-grade equivalents on the record. DuPont bolsters its claim that all off-grade films are undervalued by pointing to one model of off-grade film that did not approximate the average costs of other PET film types. DuPont's Mem. Supp. Mot. J. Agency R. at 53–63.

Commerce supports its Final Results decision, noting that SKC reported actual costs and did not allocate costs between prime and off-grade films based on relative value. Def.'s Partial Opp'n to Mot. J. Agency R. at 34–36. SKC agrees generally with the position taken by Commerce. SKC's Opp'n to Mot. J. Agency R. at 17–21.

■ As the prime and off-grade films at issue are co-products, and not by-products, the CAFC's decision in *IPSCO* applies. Under *IPSCO,* actual costs of materials, labor, capital and overhead must be used in calculating product COP and CV. 965 F.2d at 1060; *see also U.S. Steel Group, a Unit of USX Corp. v. United States,* 22 CIT ——, ——, 998 F.Supp. 1151, 1159 (1998). Moreover, costs may not be allocated between different grades of products based on their relative value. *IPSCO,* 965 F.2d at 1061; *see also Thai Pineapple,* 20 CIT at ——, 946 F.Supp. at 23 (stating that, under *IPSCO,* Commerce may not rely on output price-based allocation methodologies). Upon review of the record, the Court concludes that SKC properly reported its off-grade costs in

---

2. The court in *E.I. DuPont* determined that plaintiffs failed to properly raise the issue of SKC's costing of recycled PET chips at the administrative level but, nevertheless, concluded that SKC's methodology was reasonable. 20 CIT at ——, 932 F.Supp. at 301.

a manner that reflected actual costs of production and did not allocate costs between prime-grade and off-grade films.

The Court is not convinced by DuPont's assertion that SKC undervalued all off-grade actual costs because the reported costs for one model of off-grade film did not approximate the average costs of other PET film types. As Commerce noted in the Final Results, 60 Fed.Reg. at 42,840, due to the numerous models of PET film sold of both grades, models exist with costs both above and below the average.

DuPont's complaint appears to center around the ramifications of SKC's recycled film methodology. Under this methodology, the final costs of prime-grade and off-grade film are not always identical because SKC does not subtract from finished film cost the cost of scrap film produced during a particular production run that is recycled. Hence, these costs remain in the cost of prime-grade films, but not off-grade films. First, the Court determined above that Commerce's acceptance of SKC's recycled film methodology is reasonable. Moreover, the fact that SKC's prime grade and off-grade films had different costs does not suggest that the costs assigned to them were not their actual costs, as required by *IPSCO;* co-product actual costs are not necessarily equal.[3] As SKC demonstrated in its questionnaire responses, it has accurately reported the actual costs of off-grade film. *See SKC's Questionnaire Response, Section VIII,* C.R. Doc. No. 7, at 14–16, SKC's App., Ex. 1 (Oct. 16, 1992) (stating that SKC determined chip costs for each PET film by accumulating the total costs for each specific PET film (type, grade and thickness) according to actual virgin chip and recycled chip usage).

Consequently, because SKC's reported off-grade costs reflect actual costs in accordance with *IPSCO* and because SKC did not allocate costs between prime and off-grade films based on relative value, the Court concludes that Commerce's acceptance of these costs is supported by substantial evidence.

### 3. *Acceptance of SKC's Product–Specific Costs*

■ SKC submitted product-specific costs, which Commerce accepted without verifying in this review. *Final Results,* 60 Fed.Reg. at 42,839. However, Commerce had verified and accepted SKC's product-specific cost methodology in the original antidumping investigation. DuPont contests Commerce's decision, alleging that Commerce unlawfully decided not to verify SKC's response and that SKC's costs do not provide actual costs, as mandated by *IPSCO.* DuPont's Mem. Supp. Mot. J. Agency R. at 63–67.

According to the statute, Commerce is required to perform verifications during administrative reviews only following a timely request by an interested party or if no verification was performed in the two immediately preceding reviews. *See* 19 U.S.C. § 1677e(b)(3); *see also* 19 C.F.R. § 353.36(a)(v). The only exception is when Commerce receives a timely request for verification and determines that "good cause" exists for verification, a determination that is within Commerce's discretion. *See* 19 C.F.R. § 353.36(a)(iv); *Torrington Co. v. United States,* 17 CIT 560, 565, 824 F.Supp. 1095, 1101 (1993), *aff'd,* 44 F.3d 1572 (Fed. Cir.1995).

The Court concludes that Commerce reasonably determined that good cause did not exist for verification of SKC's response. First, this court has upheld Commerce's acceptance of SKC's identical methodology for calculating product-specific costs. *E.I. Du-*

---

**3.** This case is factually distinguishable from *IPSCO.* The products at issue in *IPSCO* were prime and limited-service grades of steel pipe, which were separated based on stress and serviceability tests. 965 F.2d at 1057–58. The court concluded that, because the producer expended the same materials, capital, labor, and overhead in the manufacturing lot that produced both grades of pipe, the CV of a quantity of limited-service pipe "necessarily matched" that of the same quantity of prime pipe. *Id.* at 1060.

In this case, SKC has not expended the same materials cost input for the resultant prime and off-grade film, a fact reinforced by SKC's production accounting, which assigns a zero value to recycled materials because the materials costs of the recycled chips have already been fully captured in the accounting for the virgin chips. Consequently, unlike *IPSCO,* the *actual* costs of the co-products produced in this case are not *identical.*

*Pont,* 20 CIT at ——, 932 F.Supp. at 302–03. Nevertheless, Commerce took measures to ensure that SKC's responses in the first review were accurate by issuing supplemental questionnaires on cost of production information, which tracked DuPont's concerns over SKC's original questionnaire responses. *See Letter from Import Administration Transmitting Supplemental Cost Questionnaire for SKC,* P.R. Doc. No. 110, Def.'s App., Ex. 8 (Apr. 20, 1993).

Consequently, in light of Commerce's discretion and this court's decision in *E.I. DuPont,* the Court concludes that Commerce's decision not to verify SKC's product-specific costs and Commerce's acceptance of these costs is supported by substantial evidence.

### 4. Whether SKC, Cheil and Kolon Manipulated Roll Film Pricing on U.S. Sales

■ DuPont claims that Commerce failed to adequately investigate DuPont's allegation that Cheil had manipulated reported prices to Anacomp when SKC had the incentive and means to manipulate such prices. DuPont contends it identified discrepancies between nominal and actual weight of roll film sales, allegedly caused by SKC providing a greater quantity of film than that required in the contract, thereby lowering the actual price per pound of sold film. DuPont's Mem. Supp. Mot. J. Agency R. at 67–70.

Upon review of the record, the Court concludes that Commerce's determination that there was no manipulation by SKC is supported by substantial evidence. The formula and calculations DuPont submitted to support its position were based on minimum width, length and thickness requirements specified in the Anacomp contract. *See DuPont's Comments on the Preliminary Results,* P.R. Doc. No. 221, Def.'s App., Ex. 14 (Aug. 11, 1994); *SKC Supplemental Questionnaire Response,* P.R. Doc. No. 103, Def.'s App., Ex. 9 (Apr. 19, 1993). However, DuPont's calculations were based on an inaccurate minimum length value which, when applied to one customer order, understated the film quantity on a particular sale. When the accurate value was substituted, this discrepancy was resolved. *See SKC Administrative Rebuttal Brief,* P.R. Doc. No. 231, at 22,

Def.'s App., Ex. 16 (Aug. 24, 1994). DuPont's remaining "evidence" consists of unsubstantiated claims that it is industry practice to deliver excess film to ensure that producers do not deliver short footage rolls. The record, however, does not demonstrate any such discrepancies between nominal and actual weight quantities in the SKC roll film sales at issue.

■ DuPont's allegation that Cheil and Kolon manipulated roll film prices was not raised during the administrative proceedings and, therefore, is not properly before this Court. *See* 28 U.S.C. § 2637(d) (1994); *Saarstahl Ag v. United States,* 20 CIT ——, ——, 949 F.Supp. 863, 868 (1996) (noting that the Court would usurp the agency's function by setting aside an agency determination on a ground not presented before the agency, and which the agency did not have the opportunity to consider); *see also Rhone Poulenc, Inc. v. United States,* 899 F.2d 1185, 1191 (Fed.Cir.1990).

### 5. Acceptance of Kolon's Inventory Carrying Costs

■ Kolon's initial questionnaire response excluded exporter's sales price ("ESP") sales made during the period of review, January 1991 to May 1992, but that entered before November 30, 1990. *See Kolon Questionnaire Response,* P.R. Doc. No. 47, at 53, Def.'s App., Ex. 4 (Oct. 14, 1992). Pursuant to Commerce's request, Kolon subsequently revised its sales listing to include these sales. *See Kolon Supplemental Questionnaire Response,* P.R. Doc. No. 165, at 2, Def.'s App., Ex. 12 (July 28, 1993). Relying on Kolon's data allocating total expenses during the period of review over total sales value during the review period, Commerce deducted Kolon's reported inventory carrying costs incurred on its ESP sales from U.S. price. *See Final Results,* 60 Fed.Reg. at 42,840.

DuPont argues Kolon's allocation methodology understates the quantity of expenses by excluding the later-reported ESP sales that were made during the period of review but that entered prior to November 30, 1990. DuPont essentially contends that Kolon's inventory carrying cost methodology also

should have been revised to account for the additional sales Kolon supplied in its supplemental response. DuPont further alleges that Commerce did not require transaction-specific data, although it was available, but instead accepted Kolon's average inventory carrying costs for the period of review. DuPont's Mem. Supp. Mot. J. Agency R. at 87–88.

Commerce responds that it properly accepted Kolon's methodology because it accounted for all sales made during the period of review. In particular, Commerce maintains that Kolon's methodology was not tied to specific sales reported during the period of review, and so, the methodology automatically accounted for the later-reported ESP sales. Def.'s Partial Opp'n to Mot. J. Agency R. at 44–46.

Kolon agrees generally with the position taken by Commerce, emphasizing that the inventory carrying costs at issue were not based on costs associated with particular sales reported in its initial questionnaire response but, rather, on the total costs its U.S. subsidiary incurred during the period of review. Kolon's Opp'n to Mot. J. Agency R. at 7–19.

■ As a preliminary matter, it is fully within Commerce's discretion to calculate inventory carrying costs based on the average inventory period, as opposed to transaction-specific inventory periods. First, Commerce has been granted deference in deciding what methodology to use in carrying out its statutory responsibilities. See Ceramica Regiomontana, S.A. v. United States, 10 CIT 399, 404, 636 F.Supp. 961, 966 (1986), aff'd, 810 F.2d 1137 (Fed.Cir.1987). Moreover, Commerce's determinations have consistently accepted an average inventory period using an inventory turnover analysis in calculating inventory carrying costs. See, e.g., Color Television Receivers, Except for Video Monitors, From Taiwan; Final Results, 55 Fed.Reg. 47,093, 47,098 (Nov. 9, 1990) ("[T]he cost of carrying merchandise in inventory is indirect and is not absorbed by one particular television set, but by the company's entire operations. It is not necessary to allocate indirect expenses specifically to particular models or sales."); see also Television Receivers, Monochrome and Color, From Japan; Final Results of Antidumping Duty Administrative Reviews, 56 Fed.Reg. 24,370, 24,371 (May 30, 1991).

The Court concludes that Commerce's acceptance of Kolon's reported inventory carrying costs is supported by substantial evidence. Because Kolon based its methodology on total expenses and invoices during the period of review, its calculations were not affected by the inclusion or exclusion of merchandise that entered the United States prior to the period of review. As Commerce verified Kolon's methodology by tracing the reported figures to actual data from Kolon's inventory transaction journal and found no discrepancies, see Kolon Verification Report, P.R. Doc. No. 180, at 22–23, Def.'s App., Ex. 13 (Nov. 18, 1993), Commerce properly concluded that Kolon's methodology was not distortive.

6. *Selection of Interest Rate Used to Calculate SKC's Imputed Credit Expense on its U.S. Sales to Anacomp*

SKC reported an imputed credit expense on its United States sales of PET film to one of its U.S. customers, Anacomp, using an interest rate based on the type of loan associated with the sale. See SKC Questionnaire Response, Part VIII, P.R. Doc. No. 49, at App. VII–6, Def.'s App., Ex. 5 (Oct. 16, 1992). In the Preliminary Results, Commerce accepted SKC's imputed credit expense on sales to Anacomp, but did not offset SKC's imputed credit expense on those sales by the actual interest income received pursuant to SKC's contract with Anacomp. See Preliminary Analysis Memorandum for SKC, P.R. Doc. No. 194, at 11, SKC's App., Ex. 9 (Apr. 22, 1994). In the Final Results, however, Commerce accepted this calculation in accordance with its established practice, further noting that the loans SKC used to calculate its short-term borrowing rate were short-term loans from U.S. banks denominated in U.S. dollars. See 60 Fed.Reg. at 42,838–39.

DuPont disagrees with this short-term interest rate, arguing that it fails to accurately reflect SKC's true cost of extending credit to Anacomp. Relying on the CAFC's decision

in *LMI–La Metalli Industriale, S.p.A. v. United States,* 912 F.2d 455 (Fed.Cir.1990), DuPont claims that Commerce should use a higher interest rate because the short-term interest SKC used for sales to Anacomp does not, in its unusual duration and conditions, reflect the commercial realities of extending credit to a company in weak financial condition. DuPont's Mem. Supp. Mot. J. Agency R. at 71–80.

Commerce agrees to a remand to reconsider its acceptance of the interest rate SKC selected in light of *LMI–La Metalli.* Def.'s Partial Opp'n to Mot. J. Agency R. at 47–48.

SKC objects to a remand, claiming first that DuPont's complaint is untimely. SKC further alleges that DuPont's claim fails on the merits, as there is no support for the proposition that imputed credit costs should be arbitrarily inflated to account for the perceived creditworthiness of the buyer. SKC claims this is especially true because the purpose of the imputed credit expense adjustment is to measure the opportunity cost to SKC of not receiving immediate payment, which depends on SKC's, not Anacomp's, cost of borrowing. Moreover, SKC contends DuPont improperly compares the rate at issue to an admittedly high rate in SKC's contract with Anacomp that applies solely to payments that are overdue and is, therefore, in the nature of an interest penalty. SKC's Opp'n to Mot. J. Agency R. at 21–30.

 As a preliminary matter, this issue is properly before the Court. A plaintiff that does not exhaust its administrative remedies is estopped from raising the claim before the court, as the court would usurp Commerce's function by examining an agency's determination upon a ground not presented before Commerce. *See* 28 U.S.C. § 2637(d); *Saarstahl,* 20 CIT at ——, 949 F.Supp. at 868; *see also Magnesium Corp. of Am. v. United States,* 20 CIT ——, ——, 938 F.Supp. 885, 906 (1996). The Court may only consider issues that have not been exhausted below in exceptional cases where injustice would arise by applying strictly the general rule of exhaustion. *See Mitsui & Co. v. United States,* 18 CIT 185, 194 (1994) (quoting *Hormel v. Helvering,* 312 U.S. 552, 557, 61 S.Ct. 719, 85 L.Ed. 1037 (1941)).

Under Commerce's regulations, a plaintiff's case brief must contain "all arguments that continue in the submitter's view to be relevant to [Commerce's] final determination," and a plaintiff's rebuttal brief must be limited to issues raised in the other parties' case briefs. 19 C.F.R. §§ 353.38(c)(2) & (d). In the instant case, SKC painstakingly points out that DuPont's only argument regarding the interest rate used in the SKC credit expense calculation was that SKC had improperly included in its short-term borrowing rate certain Eurodollar loans, an argument they later abandoned. *See DuPont's Administrative Case Brief,* C.R. Doc. No. 73, at 22, Fiche 147 (Aug. 10, 1994). Indeed, the record indicates that DuPont first raised the issue of Anacomp's cost of borrowing in their rebuttal brief before Commerce at the administrative level. *See DuPont's Administrative Rebuttal Brief,* C.R. Doc. No. 76, at 2–7, SKC's App., Ex. 10 (Aug. 24, 1994). Although DuPont timely objected to SKC's proposed offset in its rebuttal brief, it also disputed Commerce's disregard of Anacomp's allegedly weak financial condition in its calculation of imputed credit expenses. DuPont, therefore, advanced a new affirmative argument in its administrative rebuttal brief, hence failing to properly exhaust its administrative remedies.

Nevertheless, the Court concludes that the present situation is an exceptional case where injustice would arise by applying strictly the general rule of exhaustion. Although "a request by Commerce for remand does not control the Court," *Gulf States Tube Div. of Quanex Corp. v. United States,* 21 CIT ——, ——, 981 F.Supp. 630, 647 (1997), the Court deems it significant that Commerce has requested a remand to reconsider its position. *See Magnesium,* 20 CIT at ——, 938 F.Supp. at 898 (granting Commerce's request for a remand to correct its calculation of certain expenses even though plaintiff had not exhausted its administrative remedies in contesting the calculations at issue). This is particularly true in the circumstances of this case, where Commerce asks for a remand to correct its Final Results in accordance with a CAFC decision.

That being said, upon review of the record, the Court agrees that a remand is necessary in this case. In *LMI–La Metalli,* the CAFC held that the interest rate used to calculate imputed credit expenses should be selected on the basis of "usual and reasonable commercial behavior." 912 F.2d at 461. As Commerce notes, it did not take into account Anacomp's financial condition in the Final Results. Consequently, this issue is remanded for Commerce to determine whether, in light of Anacomp's financial condition, SKC's reported short-term interest rate is consistent with *LMI–La Metalli* and to provide a clearly articulated rationale to support its determination.

### 7. Deduction of Inventory Carrying Costs from Cheil's Foreign Market Value in Purchase Price Sales

During the period of review, Cheil made only purchase price sales to the United States. Cheil reported inventory carrying costs in the home market for sales with respect to which there was a lag time between the date the sold merchandise left its factory and the day it was shipped to the United States as a selling expense and calculated them on a transaction-by-transaction basis. *Cheil's Questionnaire Response,* P.R. Doc. No. 44, at 41–54, Def.'s App., Ex. 3 (Oct. 13, 1992). In the Final Results, Commerce made a comparable deduction to home market inventory carrying costs because a deduction was made from U.S. price for such costs. *See* 60 Fed.Reg. at 42,838.

DuPont argues that Commerce's decision was improper, as its established practice has been to account for such expenses only when incurred on ESP sales. DuPont's Mem. Supp. Mot. J. Agency R. at 80–87.

Commerce consents to a remand to reconsider its decision to deduct Cheil's inventory carrying costs from foreign market value ("FMV"). Def.'s Partial Opp'n to Mot. J. Agency R. at 48–49.

Cheil objects to a remand, claiming that, under the circumstances of this case, it was appropriate to deduct inventory carrying costs from FMV. Cheil argues that, because Commerce decided to deduct U.S. inventory carrying costs from U.S. price, even though Cheil's sales were purchase price sales, it was appropriate similarly to deduct home market inventory carrying costs from FMV to ensure an apples-to-apples comparison. In the alternative, Cheil asks that, if the Court decides that Commerce should follow its normal practice and not deduct U.S. inventory carrying costs from U.S. price, then it also should require Commerce not to deduct home market inventory carrying costs from FMV. Cheil's Opp'n to Mot. J. Agency R. at 33–35.

Upon review of the record, the Court agrees that a remand is necessary for Commerce to reconsider its position in the Final Results. Because Commerce has considered inventory carrying costs to be indirect selling expenses, it normally has not deducted these expenses from U.S. price on purchase price sales and, therefore, normally has not made such deductions from FMV. Consequently, this issue is remanded to Commerce to reconsider its decision to deduct Cheil's inventory carrying costs from FMV.

### Conclusion

In accordance with the foregoing opinion, this case is remanded to Commerce to: (1) determine whether, in light of Anacomp's financial condition, SKC's reported short-term interest rate is consistent with *LMI–La Metalli* and to provide a clearly articulated rationale to support its determination; and (2) reconsider its decision to deduct Cheil's inventory carrying costs from FMV. Commerce is sustained as to all other issues.

### ORDER

This case having been duly submitted for a decision and the Court, after due deliberation, having rendered a decision herein; now, in accordance with said decision, it is hereby

**ORDERED** that this case is remanded to the Department of Commerce, International Trade Administration ("Commerce"), to determine whether, in light of Anacomp, Inc.'s financial condition, SKC Limited and SKC America, Inc.'s reported short-term interest rate is consistent with *LMI–La Metalli Industriale, S.p.A. v. United States,* 912 F.2d 455 (Fed.Cir.1990), and to provide a clearly

articulated rationale to support its determination; and it is further

**ORDERED** that Commerce is to reconsider its decision to deduct Cheil's inventory carrying costs from foreign market value; and it is further

**ORDERED** that Commerce is sustained as to all other issues; and it is further

**ORDERED** that the remand results are due within ninety (90) days of the date that this opinion is entered. Any comments or responses by the parties to the remand results are due within thirty (30) days thereafter. Any rebuttal comments are due within fifteen (15) days of the date that the responses or comments are due.